# United States Court of Appeals for the Federal Circuit

---

**UNITED STATES STEEL CORPORATION,**
*Plaintiff-Appellant,*

**and**

**NUCOR CORPORATION,**
*Plaintiff-Appellant,*

**and**

**GALLATIN STEEL COMPANY, SSAB NORTH AMERICAN DIVISION, STEEL DYNAMICS, INC., AND ARCELORMITTAL USA, INC.**
*Plaintiffs,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**CORUS STAAL BV,**
*Defendant-Appellee.*

---

2009-1572, -1573

---

Appeal from the United States Court of International Trade in Consolidated Case No. 07-00170, Judge Judith M. Barzilay.

---

Decided: October 4, 2010

————————————————

JEFFREY D. GERRISH, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for plaintiff-appellant United States Steel Corporation. With him on the brief were ROBERT E. LIGHTHIZER, ELLEN J. SCHNEIDER and LUKE A. MEISNER. Of counsel was JAMES C. HECHT.

TIMOTHY C. BRIGHTBILL, Wiley Rein LLP, of Washington, DC, argued for plaintiff-appellant Nucor Corporation. With him on the brief were ALAN H. PRICE and MAUREEN E. THORSON.

CLAUDIA BURKE, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was SAPNA SHARMA, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

JAMIE B. BEABER, Steptoe & Johnson LLP, of Washington, DC, argued for defendant-appellee Corus Staal BV. With him on the brief were JOEL D. KAUFMAN and ALICE A. KIPEL. Of counsel was RICHARD O. CUNNINGHAM.

————————————————

Before LOURIE, LINN, and DYK, *Circuit Judges*.

LOURIE, *Circuit Judge*.

United States Steel Corp. ("U.S. Steel") and Nucor Corp. ("Nucor" and collectively "Appellants") appeal from

the decision of the United States Court of International Trade upholding the Department of Commerce's ("Commerce's") determination of antidumping duties against Corus Staal ("Corus") for imports of hot-rolled carbon steel flat products from the Netherlands. *U.S. Steel Corp. v. United States*, 637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) ("*U.S. Steel*").

Because the Court of International Trade properly found that Commerce's interpretation of its governing statute is in accordance with law, we affirm.

## BACKGROUND

Under the antidumping statute, Commerce imposes duties on imported merchandise that "is being, or is likely to be, sold in the United States at less than fair value" and harms domestic industry. 19 U.S.C. § 1673. Sales at less than fair value are those sales for which the "normal value" (the price a producer charges in its home market) exceeds the "export price" (the price of the product in the United States) or "constructed export price." *Id.* § 1677(35)(A).[1]  Commerce then calculates a "dumping margin" for a particular product subject to review, equal to "the amount by which the normal value exceeds the export price or constructed export price." *Id.*; *see also Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1342 (Fed. Cir. 2001). A "weighted average dumping margin" across the products is calculated by "dividing the aggregate

---

[1]  Commerce uses a constructed export price if "before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826, at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA").

dumping margins . . . by the aggregate export prices . . . of such exporter or producer." 19 U.S.C. § 1677(35)(B).

In November 2001, Commerce issued an antidumping duty order against Corus imposing a dumping margin of 2.59%. *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*, 66 Fed. Reg. 59,565 (Dep't Commerce Nov. 29, 2001) (amended final determination of sales at less than fair value). In determining the dumping margin, Commerce adhered to its existing practice at the time of "zeroing," by which Commerce assigns a value of zero to sales margins of merchandise sold at or above fair value prices. *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1345-46 (Fed. Cir. 2005). Thus, "dumping margins for sales below normal value are not offset by 'negative dumping margins' for those sales made above normal value." *Corus Staal BV v. United States*, 502 F.3d 1370, 1372 (Fed. Cir. 2007). Commerce's zeroing methodology had earlier been challenged and upheld as a reasonable interpretation of the antidumping statute. *See id.*; *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (upholding zeroing in the context of an administrative review); *see also Serampore Indus. v. U.S. Dep't Commerce*, 675 F. Supp. 1354, 1360-61 (Ct. Int'l Trade 1987); *Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States*, 926 F. Supp. 1138, 1150 (Ct. Int'l Trade 1996).

However, the U.S. practice of zeroing—both as a general methodology and as applied in specific investigations, including the investigation underlying this appeal—was successfully challenged by the European Communities before the World Trade Organization's ("WTO's") Dispute Settlement Body. Panel Report, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R (October 31, 2005), and the challenge was subsequently upheld by that organiza-

tion's Appellate Body, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R (May 15, 2006) (upholding the Dispute Settlement Panel's finding that the United States acted inconsistently with Article 9.3 of the Anti-Dumping Agreement and Article VI:2 of the General Agreement on Tariffs and Trade 1994). The investigation of hot-rolled steel from the Netherlands was one of the 15 investigations challenged.

Commerce responded to the adverse WTO ruling that zeroing is inconsistent with United States obligations under the Antidumping Duty Agreement according to two administrative procedures, laid out in the Uruguay Round Agreements Act ("URAA"). *See* 19 U.S.C. § 3533 ("Section 123") *and* 19 U.S.C. § 3538 ("Section 129"). Section 123 provides, in relevant part, that

> Promptly after the circulation of a report of a panel or of the Appellate Body to WTO members in a proceeding described in subsection (d) of this section, the Trade Representative shall--
>
> (1) notify the appropriate congressional committees of the report;
>
> (2) in the case of a report of a panel, consult with the appropriate congressional committees concerning the nature of any appeal that may be taken of the report; and
>
> (3) if the report is adverse to the United States, consult with the appropriate congressional committees concerning whether to implement the report's recommendation and, if so, the manner of such implementation and the period of time needed for such implementation.

19 U.S.C. § 3533(f).  The statute continues by listing the requirements for agency action:

> In any case in which a dispute settlement panel or the Appellate Body finds in its report that a regulation or practice of a department or agency of the United States is inconsistent with any of the Uruguay Round Agreements, that regulation or practice may not be amended, rescinded, or otherwise modified in the implementation of such report unless and until--
>
> . . .
>
> (D) the Trade Representative has submitted to the appropriate congressional committees a report describing the proposed modification, the reasons for the modification, and a summary of the advice obtained under subparagraph (B) with respect to the modification;
>
> (E) the Trade Representative and the head of the relevant department or agency have consulted with the appropriate congressional committees on the proposed contents of the final rule or other modification . . . .

19 U.S.C. § 3533(g).

Section 123 describes how Commerce and the United States Trade Representative are to implement an adverse report from the WTO.  Pursuant to Section 123, the United States Trade Representative consulted with appropriate Congressional committees and private sector committees, and Commerce provided for public comment before determining whether and how to change its practice.  Following those consultations, Commerce determined that it would cease its zeroing practice in new and pending investigations using average-to-average compari-

son methodology. *See Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation; Final Modification*, 71 Fed. Reg. 77, 722 (Dec. 27, 2006) ("Section 123 Determination").[2]  Instead, Commerce determined to use a methodology of "offsetting," pursuant to which sales made at less than fair value are offset by those made above fair value.  This means that some of the dumping margins used to calculate a weighted-average dumping margin will be negative.

The other relevant statutory section, section 129, provides in relevant part as follows:

> Promptly after a report by a dispute settlement panel or the Appellate Body is issued that contains findings that an action by the administering authority in a proceeding under title VII of the Tariff Act of 1930. . . is not in conformity with the obligations of the United States under the Antidumping Agreement. . ., the Trade Representative shall consult with the administering authority and the congressional committees on the matter.
>
> (2) Determination by administering authority
>
> Notwithstanding any provision of the Tariff Act of 1930 . . ., the administering authority shall, within 180 days after receipt of a written request from the Trade Representative, issue a determination in connection with the particular proceeding that would render the administering authority's action described

---

[2]    The difference between average-to-average comparisons and other methodologies is discussed in the section II, *infra.*  Commerce did not adopt changes to its comparison methodologies used in other segments of an antidumping proceeding. *See* 71 Fed. Reg. at 77, 724.

in paragraph (1) not inconsistent with the findings of the panel or the Appellate Body.

(3) Consultations before implementation

Before the administering authority implements any determination under paragraph (2), the Trade Representative shall consult with the administering authority and the congressional committees with respect to such determination.

(4) Implementation of determination

The Trade Representative may, after consulting with the administering authority and the congressional committees under paragraph (3), direct the administering authority to implement, in whole or in part, the determination made under paragraph (2).

19 U.S.C. § 3538(b).

Section 129 applies to specific administrative determinations that are the subject of a WTO dispute. Pursuant to Section 129, following an adverse WTO ruling on particular investigations, the United States Trade Representative must consult with Commerce and with Congress, after which it may instruct Commerce to issue a new decision "not inconsistent with the findings of the [WTO]." 19 U.S.C. § 3538(b)(2). Here, pursuant to Section 129, Commerce applied its new methodology to the investigation of hot-rolled steel from the Netherlands. Under its offsetting methodology, Commerce found that the resulting dumping margin was *de minimis*. As a result, Commerce announced that it would revoke the antidumping duty order in that investigation. *Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and*

*Partial Revocations of Certain Antidumping Duty Orders*, 72 Fed. Reg. 25,261, 25,264 (Dep't of Commerce May 4, 2007) ("Section 129 Determination").

Four separate actions were filed at the Court of International Trade, challenging Commerce's determinations. The actions were consolidated, and the challenges brought pursuant to section 123 were dismissed for lack of jurisdiction. *U.S. Steel Corp. v. United States*, 627 F. Supp. 2d 1374, 1381-82 (Ct. Int'l Trade 2009). The court based its dismissal on its finding that adequate relief was available from its review of the section 129 determinations, for which jurisdiction derived from 28 U.S.C. § 1581(c); as a result, jurisdiction pursuant to section 1581(i) could not lie, as that section denies jurisdiction for actions that may be brought under the other subsections of § 1581 unless the alternative relief would be manifestly inadequate. *Id.*

In its analysis of the consolidated challenge to the § 129 determinations, the Court of International Trade upheld Commerce's determinations, concluding that they were in accordance with law. *U.S. Steel*, 637 F. Supp. 2d at 1214. In so holding, the court first stated that settled precedent established that Congress had not clearly spoken to the question of zeroing in the antidumping statute, either by requiring Commerce to make a "fair comparison . . . between the export price or constructed export price and normal value" under 19 U.S.C. § 1677b(a), or by its definitions of dumping margins as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise" and weighted average dumping margins as a calculation "dividing the aggregate dumping margins . . . by the aggregate export prices and constructed export prices," under § 1677(35)(A) and (B). *Id.* at 1210-11 (citing *Timken*, 354 F.3d at 1341-43, *inter alia*). The court found that "the language in §§ 1673c(b)(2), 1673c(c), and

1677f-1(d) does not clarify Congress's intent on the issue." *Id.* Therefore, the court proceeded to an analysis of whether Commerce's methodology encompassed a reasonable interpretation of the statute, pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The Court of International Trade upheld as reasonable Commerce's interpretation of the statute to use offsetting in average-to-average comparisons of original investigations. *U.S. Steel*, 637 F. Supp. 2d at 1212-13. The court found that Commerce's determination was the "result of [] a careful balancing act, whereby the Executive Branch sought to facilitate collegial international trade relationships while continuing to afford domestic industries the protection they need to compete when unfairly traded merchandise is present in the marketplace." *Id.* at 1213. The court noted the process Commerce undertook, whereby it "solicited, received, and considered comments from members of the international trade community . . . and followed the agency's regular practice and procedure in so doing." *Id.* Commerce's use of offsetting, according to the court, fits with the principal purpose of the antidumping laws, "to protect domestic industries from foreign manufactured goods that are sold with injurious effect in the U.S. at prices below the fair market value of those goods . . ." without "giv[ing] an unfair advantage to the domestic industry." *Id.* (internal quotations omitted). The court continued, suggesting that the offsetting methodology might indeed be fairer than a zeroing methodology, as offsetting methodology requires Commerce to "consider the market as a whole when engaging in its statutorily assigned duty of determining whether dumping has occurred in the domestic industry at issue." *Id.* at 1213-14.

The Court of International Trade noted that Commerce's newly-implemented methodology was limited to average-to-average comparisons—those situations where U.S. sales of a particular class of product are grouped together before being compared with home market sales, similarly grouped together. *Id.* at 1214. The clear indication is that the agency likely will continue to use zeroing methodology for individual-to-individual transaction comparisons, made pursuant to § 1677f-1(d)(1)(A)(ii), or for weighted average-to-individual transaction comparisons aimed at counteracting targeted dumping, pursuant to § 1677f-1(d)(1)(B). Thus, the court reasoned, Commerce's interpretation does not render §§ 1673c(b)(2), 1673c(c), and 1677f-1(d) meaningless. *Id.* at 1215.

The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the decision of the Court of International Trade *de novo*, "apply[ing] anew the same standard used by the court, and [we] will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (citation and internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The court must, as we do, defer to Commerce's reasonable construction of its governing statute where Congress "leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circum-

stances.'" *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). In order to effectuate review of the reasonableness of agency action, "[c]ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). Because the Court of International Trade correctly concluded that Commerce, engaged in its gap-filling role, implemented a reasonable methodology of determining dumping margins, we affirm.

## I.

As a preliminary matter, Corus raises a jurisdictional argument, suggesting that the Court of International Trade improperly entertained claims challenging Commerce's Section 123 Determination. Corus then argues that any affirmance of the court's decision should be without reference to the Section 123 Determination. Corus relies on the Court of International Trade's jurisdictional statute, 28 U.S.C. § 1581(c), which allows it to hear actions brought under 19 U.S.C. § 1516a. That section provides for review of Section 129 determinations, but not Section 123 determinations, according to Corus. Corus further argues that the Section 123 Determination was not at issue in this case, because it announced a policy to be applied to future investigations and reviews in addition to those then pending. However, the investigations specifically challenged before the WTO were already complete, and, as such, were only challenged in the context of Section 129 proceedings. As a result, Corus argues, the court erred in hearing U.S. Steel's challenge to the offsetting methodology announced in its Section 123 Determination.

The government's position is that the Court of International Trade correctly found that it has jurisdiction only under 28 U.S.C. § 1581(c), and thus could only review the Section 129 Determination, not the Section 123 Determination. The government contends that the court only discussed the substance of the Section 123 Determination in the context of the application of its announced methodology to the Section 129 Determination. As a result, the government maintains that the court exercised its jurisdiction correctly.

Appellants argue in their reply briefs that we may properly consider whether the Section 123 Determination is unlawful on its face, because the Section 123 Determination was applied to the Section 129 Determination at issue here.

We conclude that the Court of International Trade properly exercised its jurisdiction in this case, pursuant to 28 U.S.C. § 1581(c). Appellants correctly point out that the issues and decision memorandum accompanying the Section 129 Determination states that Commerce is "conducting 'Section 129 Determinations' with respect to twelve different antidumping investigations . . . and applying the [Section 123 Determination] to those proceedings." J.A. 805. We agree with the government's reading of the court's decision. To begin with, the court dismissed the cases directly challenging the Section 123 Determination, having found that alternative adequate relief was available in the current action challenging the Section 129 Determination. *U.S. Steel Corp.*, 627 F. Supp. 2d at 1381-82. In addition, the court discussed the Section 123 Determination only in the context of its application to the Section 129 Determination. In particular, the court looked to Commerce's explanation and reasoning for its Section 123 Determination in making its determination as to the reasonableness of its interpretation as

implemented in the Section 129 proceeding. The court was thus correct in finding jurisdiction over the Section 129 claim, and it exercised that jurisdiction properly.

## II.

We turn now to the substance of the case. Nucor argues that the antidumping statute is unambiguous and requires that Commerce use a zeroing methodology. Nucor argues that the *Timken* court erred in finding that the term "exceeds" is ambiguous; therefore, it argues, a dumping margin, as defined by 19 U.S.C. § 1677(35)(A), must have a positive value. In support of that view, Nucor notes that the term "exceeds" is used elsewhere in the Tariff Act to mean that one thing is greater than another, rather than indicating the difference between the two. In addition, Nucor argues that the term is not ambiguous, that lexicographical sources confirm that it is not ambiguous, and that the *Timken* court's decision was logically flawed. As a result, Nucor suggests that this court should revisit *Timken*, recognizing that any such reconsideration would have to be *en banc*.

Both Nucor and U.S. Steel argue that 19 U.S.C. § 1677f-1(d) indicates Congress's clear intent that Commerce implement a zeroing methodology, although the bases for their arguments differ slightly from each other. Section 1677f-1(d) describes how Commerce is to determine a weighted average dumping margin. Section 1677f-1(d)(1)(A) prescribes use of average-to-average comparisons and individual-to-individual transaction comparisons in normal investigations.[3] In addition, the statute pro-

---

[3] The Statement of Administrative Action that accompanied the Uruguay Round Agreements Act explained that individual-to-individual transaction comparisons were intended for situations in which "there are very few sales and the merchandise sold in each market is identi-

vides for an exception under which Commerce may use average-to-individual transaction comparisons in situations where Commerce finds targeted dumping (situations where comparable merchandise "differ[s] significantly among purchasers, regions, or periods of time"). 19 U.S.C. § 1677f-1(d)(1)(B).

U.S. Steel argues the average-to-average and average-to-individual methodologies are meant for different situations. However, absent zeroing, both methodologies result in identical dumping margins. As a result, U.S. Steel argues, the provisions of § 1677f-1(d) are rendered meaningless by an interpretation that does not require zeroing, making clear that Congress intended the use of zeroing.

Both Appellants rely on the negotiating history of the General Agreement on Tariffs and Trade Multilateral Trade Negotiations for the Uruguay Round, which led to the enactment of the URAA. Under the 1930 Tariff Act, Commerce developed a practice of comparing weighted average normal values to individual U.S. transaction prices—or an average-to-individual transaction methodology—to determine dumping margins. The United States attempted to retain its average-to-individual transaction methodology during the Uruguay Round negotiations, but ultimately agreed to use of that methodology only for situations of targeted dumping (as laid out in the exception in 19 U.S.C. § 1677f-1(d)(1)(B)). The Statement of Administrative Action accordingly specified that as a "departure from current U.S. law," Commerce should now generally use average-to-average comparisons. SAA at 810, 842-43, *reprinted in* 1994 U.S.C.C.A.N. at 4153, 4178. This, according to U.S. Steel, underscores its ar-

cal . . . ." Statement of Administrative Action Accompanying the URAA, H.R. Rep. No. 403-316, 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178.

gument that Congress intended the different methodologies to be used in different situations, with the clear implication that Congress intended the results to be different under those different methodologies. This clear intent for different results under different methodologies, U.S. Steel argues, results in the statute clearly requiring zeroing.

Nucor, in contrast, compares the pre-URAA methodology with the post-URAA methodology, rather than comparing the different subsections of § 1677f-1(d). Nucor argues that because Congress believed it was changing Commerce's practice by implementing the URAA, and because, without zeroing, the pre-URAA and post-URAA dumping margins would be equal, Congress clearly intended to require zeroing in post-URAA investigations. Both Appellants argue that previous courts have not addressed arguments that § 1677f-1(d) requires zeroing and that we should do so now.

Appellants also respond to an argument by Corus suggesting that Congressional intent to use offsetting methodology may be inferred from the Congressional consultation process undertaken pursuant to Sections 123 and 129. Appellants argue that the Congressional role in those consultations is merely advisory, and does not indicate the intent of the entire Congress.

Lastly, Appellants argue that Commerce's actions in implementing an adverse WTO Panel decision must be consistent with U.S. law. Based on its argument that § 1677f-1(d) requires zeroing methodology, U.S. Steel asks the court to conclude that Commerce's actions are inconsistent with U.S. law.

In response, the government argues that the Court of International Trade correctly followed *Timken* and *Corus*, which together establish unequivocally that Commerce

was neither required to use nor prohibited from using zeroing methodology by its governing statute. The government notes that neither of the Appellants argues that Commerce's determination not to use zeroing was unreasonable. Nevertheless, the government explains why its determination not to use zeroing was reasonable. The Section 129 Determination, the government explains, is a reflection of the political branches' carefully tailored response to an adverse WTO report. The response, pursuant to Section 123 and Section 129, included solicitation of public and private sector views on possible responses, followed by a request to Commerce from the United States Trade Representative to take action not inconsistent with the WTO ruling. The government notes that through those consultations, Congress gave "tacit approval" to the new methodology. Thus, the government argues, its statutory interpretation is reasonable and this court should affirm the Court of International Trade if we determine, as we have before, that the statute is ambiguous.

In response to Appellants' section 1677f-1(d) arguments, the government notes that we have already considered and rejected U.S. Steel's argument, which it unsuccessfully argued in *Corus*. Substantively, the government responds to U.S. Steel's § 1677f-1(d) argument by explaining that Commerce continues to use zeroing in other types of investigations and reviews using methodology other than average-to-average comparisons. In addition, the government notes that Commerce continues to use zeroing in targeted dumping analyses under § 1677f-1(d)(B). As a result, the outcomes under different subsections of § 1677f-1(d) are indeed different.

Corus argues that well-established precedent makes clear that the statute is ambiguous and that Appellants' arguments, including their § 1677f-1(d) arguments, have

been refuted multiple times. Corus further argues that the consultations of the United States Trade Representative, Commerce, and Congress prior to implementing its determinations demonstrate clear Congressional intent that the adverse WTO rulings be implemented.

We turn to the language of the statute to begin our analysis, according to which "[t]he terms 'dumped' and 'dumping' refer to the sale or likely sale of goods at less than fair value." 19 U.S.C. § 1677(34). Commerce calculates a dumping margin for a particular product subject to review, defined as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." *Id.* at § 1677(35)(A). A "weighted average dumping margin" across the products is "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." *Id.* at § 1677(35)(B). The issue Appellants ask us to revisit, both generally and in light of § 1677f-1(d), is whether a weighted average dumping margin may include negative numbers in its aggregation of dumping margins.

We agree with the government that the Section 129 Determination reflects Commerce's reasonable interpretation of an ambiguous statute. Our analysis proceeds under the two-part test explained in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). At issue here is the first step of *Chevron*, which requires a court to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, that would be the end of the inquiry; however, "if the statute is silent or ambiguous with respect to the specific issue," the court determines if the agency's construction of the statute is permissible. *Id.* at 843. As explained below, we conclude that none of the cited statutory provisions

speaks to the precise issue of zeroing—or offsetting—methodology. Rather, the statute is silent as to the methodology to be employed in situations of negative dumping margins.

Our case law has repeatedly examined the antidumping statute and found it to be "silent or ambiguous" as to zeroing methodology. In *Timken*, we upheld Commerce's use of zeroing methodology in administrative reviews. *Timken*, 354 F.3d 1334.[4] We "recogniz[ed] this as a close question," and found that dictionary definitions of the term "exceeds" were not "so clear as to compel a finding that Congress expressly intended to require zeroing." *Id.* at 1341. We determined that the language of §1677(35)(A) does not prohibit the calculation of a negative margin. *Id.* at 1342. Because the statute does not speak directly to negative-value dumping margins, we declined to find a clear and unambiguous Congressional intent that Commerce use zeroing methodology. *Id.* In finding that use of zeroing methodology in administrative reviews was a reasonable interpretation of the statute, we noted, *inter alia*, two opinions of the Court of International Trade that found zeroing to be useful for "combat[ing] the problem of masked dumping, wherein certain profitable sales serve to 'mask' sales at less than fair value." *Id.* at 1343 (citing *Serampore*, 675 F. Supp. at 1360-61; *Bowe Passat*, 926 F. Supp. at 1150). In *Corus*, we extended *Timken* and concluded that Commerce's application of zeroing methodology to original investigations was a reasonable interpretation of the statute. *Corus*, 395 F.3d at 1347. We disagreed with Corus's

---

[4] In that context, Commerce was comparing weighted-average normal values to transaction-specific export prices pursuant to 19 U.S.C. § 1675(a)(2)(A)(ii), which governs administrative reviews. *See Timken Co. v. United States*, 240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002).

argument in that case that 19 U.S.C. § 1677f-1(d)(1)(A)(i) showed a clear Congressional intent that offsetting, rather than zeroing, methodology be used by requiring the comparison of a weighted average dumping margin and signaling, by use of the word "average," that negative values were to be included. *Id.* We declined to draw such a distinction, finding that the ambiguity of the statute was not dependent on the type of review being conducted, as the terms at issue were those in § 1677(35)(A) and were not dependent on the type of review. *Id.*

We are bound by our previous decisions in *Timken* and *Corus*, which held that § 1677(35)(A) does not unambiguously preclude—or require—Commerce to use zeroing methodology. *See Texas Am. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision."). Moreover, we agree with those decisions. The statute defines a dumping margin as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise," 19 U.S.C. § 1677(35)(A), and subsequently requires Commerce to use this amount in calculating a weighted-average dumping margin, *id.* § 1677(35)(B). However, the statute is silent as to what to do when the "amount" calculated by Commerce pursuant to § 1677(35)(A) is negative. Congress has given Commerce discretion in forming its methodology in antidumping investigations, and where the statutory language does not address the methodology at issue, we decline to conclude that Congress has manifested its unambiguous intent. We find it important to note that although the processes undertaken pursuant to Sections 123 and 129 included input from Congressional committees, this later involve-

ment in Commerce's methodology cannot constitute an indication of Congressional intent, *nunc pro tunc*. Were we to find a clear Congressional intent in the language of the statute to mandate zeroing methodology, the acquiescence of Congressional committees now to the new determinations would not serve to negate it. Nevertheless, we have found no such clear intent.

Nor are Appellants' "new" arguments regarding § 1677f-1(d) persuasive. To begin with, the arguments were raised by U.S. Steel, but not found persuasive or explicitly addressed by us in *Timken* and *Corus*. Appellants' arguments do not convince us that § 1677f-1(d) constitutes a clear Congressional instruction to use zeroing methodology.

Section 1677f-1(d) describes how to determine a weighted average dumping margin, providing that Commerce

> shall determine whether the subject merchandise is being sold in the United States at less than fair value--

> (i) by *comparing the weighted average of the normal values to the weighted average of the export prices* (and constructed export prices) for comparable merchandise, *or*

> (ii) by *comparing the normal values of individual transactions to the export prices* (or constructed export prices) *of individual transactions* for comparable merchandise.

19 U.S.C. § 1677f-1(d)(1)(A) (emphases added). Thus, these subsections describe average-to-average comparisons and individual-to-individual transaction comparisons

in normal investigations. In addition, the statute provides for an exception, under which Commerce

> may determine whether the subject merchandise is being sold in the United States at less than fair value by *comparing the weighted average of the normal values to the export prices* (or constructed export prices) *of individual transactions* for comparable merchandise, *if--*

> (i) *there is a pattern of export prices* (or constructed export prices) *for comparable merchandise that differ significantly among purchasers, regions, or periods of time*, and

> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

*Id.* § 1677f-1(d)(1)(B) (emphases added). Thus, Commerce is able to use an average-to-individual transaction comparison in situations of targeted dumping. Even if we accept, *arguendo*, U.S. Steel's argument that if offsetting methodology is used in two of the comparison methods (average-to-average and average-to-individual transaction), the results are likely to be the same,[5] § 1677f-1(d) still cannot be said to require zeroing methodology.

---

[5] Corus referenced its prior responses to U.S. Steel's § 1677f-1(d) arguments in prior cases in its briefing and oral argument, suggesting that the results might not be the same under the different comparison methods, based on the use of different time periods for average-to-individual transaction methodology in comparison with the other methodologies.

Section 1677f-1(d) was enacted as part of the URAA in 1994, at a time when zeroing methodology was Commerce's standard practice. *See, e.g.*, *Serampore*, 675 F. Supp. 1354. It is reasonable, then, to assume that Congress was aware of Commerce's chosen methodology at the time of enactment. However, a Congressional assumption that Commerce will continue to implement a particular methodology is not a clear Congressional instruction that Commerce must continue to use that methodology. Section 1677f-1(d) does not speak to the question of zeroing such that a clear Congressional intent is discernable. Although Congress may have assumed that Commerce would continue its zeroing methodology, and its assumption may underlie the enumeration of different calculation methodologies in § 1677f-1(d), Commerce's choice of methodology remains a "gap" in the statute that Congress has chosen not to fill by dictating a particular methodology. *See, e.g.*, *Koyo Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995).

Similarly, Corus's argument that Congress must have meant for § 1677f-1(d) to effect a change in Commerce's calculation of dumping margins does not necessitate a conclusion that Congress intended to direct Commerce to continue its zeroing methodology indefinitely. Congress certainly could have given such instructions; however, it did not. The SAA's assertion that § 1677f-1(d) is a "departure from current U.S. law," SAA at 810, 842-43, *reprinted in* 1994 U.S.C.C.A.N. at 4153, 4178, does not give a clear indication of Congressional intent as to zeroing methodology either, but is rather an expression of its implementation of various negotiated-for changes in the statute. In addition, the exception contained in §1677f-1(d)(1)(B) indicates that Congress gave Commerce a tool for combating targeted or masked dumping by allowing Commerce to compare weighted average normal value to individual

transaction values when there is a pattern of prices that differs significantly among purchasers, regions, or periods of time. 19 U.S.C. § 1677f-1(d)(1)(B). Commerce has indicated that it likely intends to continue its zeroing methodology in those situations, thus alleviating concerns of targeted or masked dumping. That threat has been one of the most consistent rationales for Commerce's zeroing methodology in the past. *See, e.g.*, *Timken*, 354 F.3d at 1343; *Bowe Passat*, 926 F. Supp. at 1150; *Serampore*, 675 F. Supp. 1360-61. By enacting legislation that specifically addresses such situations, Congress may just as likely have been signaling to Commerce that it need not continue its zeroing methodology in situations where such significant price differences among the export prices do not exist. In sum, we find it improbable that Congress chose to manifest its clear intent through subtle implication. Thus, now as before, we find unconvincing Appellants' arguments that § 1677f-1(d) manifests a clear Congressional intent that zeroing methodology be used.

## CONCLUSION

For the foregoing reasons, we affirm the Court of International Trade's decision affirming Commerce's reasonable interpretation of the antidumping statute.

## AFFIRMED