**Slip Op. 15-46**

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

GPX INTERNATIONAL TIRE
CORPORATION and HEBEI STARBRIGHT
TIRE CO., LTD.,

                Plaintiffs,

TIANJIN UNITED TIRE & RUBBER
INTERNATIONAL CO., LTD.,

                Consolidated Plaintiff,

      v.

UNITED STATES,

                Defendant,

      and

BRIDGESTONE AMERICAS, INC.,
BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC, TITAN TIRE
CORPORATION, and UNITED STEEL,
PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO-CLC,

                Defendant-Intervenors.

</td><td>

Before: Jane A. Restani, Judge

Consol. Court No. 08-00285

</td></tr>
</table>

[Consolidated plaintiff's motion for enforcement of the judgment is granted.]

## OPINION AND ORDER

                Dated: May 18, 2015

    Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, for consolidated plaintiff Tianjin United Tire & Rubber International Co., Ltd.

Alexander V. Sverdlov, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief were Daniel J. Calhoun, Senior Counsel, and Devin S. Sikes, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Terence P. Stewart, and Philip A. Butler, Stewart and Stewart, of Washington, DC, for defendant-intervenor Titan Tire Corporation.

RESTANI, Judge: The U.S. Department of Commerce ("Commerce") is attempting to collect cash deposits at a rate the court has already determined to be invalid. Consolidated plaintiff, Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC"), brings the current motion for enforcement of the court's judgment entered October 30, 2013, and argues that under either the court's inherent power to enforce its judgments or through a writ of mandamus, the court should compel defendant, the United States, by and through its executive administrative agency, Commerce, to issue a corrected notice required by 19 U.S.C. § 1516a (2012) (also referred to as a "Timken Notice").[1] TUTRIC asks that the Timken Notice state an intent to instruct U.S. Customs and Border Protection ("CBP") to require cash deposits for estimated countervailing duties ("CVD") at 3.93% for TUTRIC's merchandise subject to the CVD order on Off-the-Road Tires from the People's Republic of China, Certain New Pneumatic Off-the-

---

[1] The Timken Notice gets its name from Timken Co. v. United States, 893 F.2d 337, 340 (Fed. Cir. 1990), because in that case the Federal Circuit established the parameters of 19 U.S.C. § 1516a(c)(1) notice publication, which requires Commerce to publish notice of a court decision "not in harmony" with an original agency determination. The notice had the effect of preventing liquidation of post-notice entries at the erroneous rate. 19 U.S.C. § 1516a(e)(1). A court ordered injunction will prevent liquidation pending litigation and normally applies to earlier entries as well. 19 U.S.C. § 1516a(c)(2), (e)(2). Such an order originally was issued in this matter on August 13, 2010, prohibiting liquidation of entries dated December 17, 2007 forward. See Statutory Inj. Order, ECF No. 324 ("Statutory Inj. Order").

Road Tires From the People's Republic of China: Countervailing Duty Order, 73 Fed. Reg.

51,627 (Dep't Commerce Sept. 4, 2008) ("OTR CVD Order"), and compelling CBP to refund

excess cash deposits collected after October 30, 2013.  The government argues that under the

Final Results of Redetermination Pursuant to Remand, ECF No. 394 ("Remand Results"),

sustained by the court, Commerce properly ordered CBP to collect cash deposits at the 6.85%

rate set in the intervening Implementation of Determinations Under Section 129 of the Uruguay

Round Agreements Act: Certain New Pneumatic Off-the-Road Tires; Circular Welded Carbon

Quality Steel Pipe; Laminated Woven Sacks; and Light-Walled Rectangular Pipe and Tube From

the People's Republic of China, 77 Fed. Reg. 52,683 (Dep't Commerce Aug. 30, 2012) ("Section

129 Implementation"), for all entries entered or withdrawn from the warehouse for consumption

on or after August 21, 2012.

The Remand Results reduced TUTRIC's CVD rate to 3.93%, which is inconsistent with

Commerce's decision to continue to require cash deposits at almost double that rate.  Further,

TUTRIC did not have notice of Commerce's intent to interpret the Section 129 Implementation

as rendering moot any court determination of a new cash deposit rate sufficient to warrant

denying TUTRIC's current motion.  Additionally, defendant-intervenor Titan Tire Corporation

("Titan"), the party with potentially the most to lose from a reduction in TUTRIC's CVD rate,

will not be prejudiced by enforcing the court's order.  The court has the authority to interpret its

own orders.  The words of the Remand Results and the context demonstrate that the effect of the

court's sustaining of the Remand Results was not, as Commerce contends, to sustain the use of

an erroneous 6.85% cash deposit rate for TUTRIC, but rather to set the rate for TUTRIC at

3.93%, as determined in the Remand Results.  Accordingly, Commerce shall issue a revised

Timken Notice setting the cash deposit rate for TUTRIC at 3.93%.

## BACKGROUND

The court presumes familiarity with the facts of the underlying case as set out in GPX International Tire Corp. v. United States, 942 F. Supp. 2d 1343, 1347–48 (CIT 2013) ("GPX VIII"), and GPX International Tire Corp. v. United States, 893 F. Supp. 2d 1296, 1304–06 (CIT 2013) ("GPX VII"), aff'd, 780 F.3d. 1136 (Fed. Cir. 2015).  For ease of understanding, however, a brief summary is provided below.

On September 4, 2008, Commerce issued a CVD order on OTR Tires from China.  OTR CVD Order, 73 Fed. Reg. 51,627.  Plaintiffs challenged the order at the United States Court of International Trade ("CIT") on several grounds, including Commerce's determination that TUTRIC was subsidized because it did not repay certain government loans.  During the pendency of the domestic litigation, the Government of China brought a case against the United States at the World Trade Organization ("WTO") challenging the applicability of the United States' CVD law to China.  See Appellate Body Report, United States—Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, WT/DS379/AB/R (Mar. 11, 2011).  The Appellate Body eventually issued a ruling that the United States was out of compliance with its WTO obligations on four issues: 1) benchmarks for loan benefits, 2) trading companies, 3) public bodies, and 4) double counting.  See id. at ¶ 611; Section 129 Implementation, 77 Fed. Reg. at 52,683–84.  After conferring with Congress, the U.S. Trade Representative ("USTR") instructed Commerce to implement the WTO's ruling under Section 129 of the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 129, 108 Stat. 4809, 4836–39 (1994) ("Section 129").  Section 129 Implementation, 77 Fed. Reg. at 52,684.

Commerce issued the Section 129 Implementation on August 30, 2012.

> The Section 129 Implementation specifically stated that as per USTR's instruction, it was
>
> to implement its determinations under section 129 of the Uruguay Round Agreements Act ("URAA") regarding the antidumping and countervailing duty investigations on certain new pneumatic off-the-road tires ("OTR Tires") from the . . . PRC . . . which renders them not inconsistent with the [WTO] dispute settlement findings in United States—Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, WT/DS379/AB/R (March 11, 2011) ("DS 379").

Id. at 52, 683. The Section 129 Implementation also stated that when Commerce informed the interested parties that it was initiating proceedings under Section 129 on August 22, 2011, that it was doing so "to implement the findings of the WTO dispute settlement panel in DS 379 with regard to the [CVD] investigations on OTR Tires." Id. TUTRIC's "revised" CVD cash deposit rate in the Section 129 Implementation was identical to that set in the OTR CVD Order, namely 6.85%.[2] Id. at 52,685; see OTR CVD Order, 73 Fed. Reg. at 51,629. Both the Section 129 Implementation as well as the original OTR CVD Order also set a rate for "All Others." Section 129 Implementation, 77 Fed. Reg. at 52,685; OTR CVD Order, 73 Fed. Reg. at 51,629. Although it had referred to the "new" rates set in the Section 129 Implementation as "amended" and "revised," Commerce stated its intention to apply the "appropriate" cash deposit rates prospectively as mandated by Section 129. Section 129 Implementation, 77 Fed. Reg. at 52,688. It did not specify that those "appropriate" rates were the "amended" or "revised" rates calculated in the Section 129 Implementation, or for that matter "unamended" or "unrevised" rates, such as TUTRIC's.

---

[2] In the Section 129 Implementation Commerce modified TUTRIC's antidumping ("AD") duty rate from 8.44% to 8.39%. 77 Fed. Reg. at 52,686. This downward amendment was not based on the loan repayment subsidy aspect of the CVD rate. See infra note 12.

All the while, TUTRIC continued to challenge a separate and distinct CVD rate

calculation issue at the CIT, i.e., that certain non-recurring loans were improperly included when

its rate was calculated because the loans had been partially repaid or were not a government

benefit. See GPX VII, 893 F. Supp. 2d at 1331–34. On remand, ordered four months after the

publication of the Section 129 Implementation, Commerce determined that some of TUTRIC's

loans in fact had been partially repaid and reduced its CVD rate accordingly to 3.93%. Remand

Results at 30–31. On October 30, 2013, over a year after the publication of the Section 129

Implementation, the court sustained Commerce's Remand Results.[3] GPX VIII, 942 F. Supp. 2d

at 1362. In the body of the Remand Results, after discussing the new rate for TUTRIC,

Commerce indicated that "should the Court sustain [the] remand redetermination, the cash

deposit rates in effect for subsequent entries will continue to be based on the intervening

administrative review for Starbright and the intervening [Section 129 Implementation] for all

other respondents." Remand Results at 50–51. Commerce did not say "all other respondents,

including TUTRIC." None of the parties addressed the impact of the Section 129

Implementation on the court's ruling at oral argument where TUTRIC's rate was discussed in

---

[3] The conclusion of the Remand Results stated without specific limitation:

> Based on the forgoing analysis and discussion, [Commerce] has decided, pursuant to the remand order of the Court, to recalculate the subsidy rate for TUTRIC's debt forgiveness, as well as its total countervailable subsidy rate. Because TUTRIC's challenge on the debt forgiveness issue did not encompass a challenge to the all-others rate, we have not recalculated the all-others rate. For the foregoing reasons, we will maintain the remainder of our determinations with the addition of the clarifying explanations noted above.

Remand Results at 51.

detail, nor did they comment on this issue following the Remand Results. See Mot. for

Enforcement of the J. 8, ECF No. 433 ("Pl. Br."); Def.'s Resp. in Opp'n to Consol. Pl.'s Mot. for

Enforcement of the Ct.'s J. 6, 23, ECF No. 436 ("Gov. Br."). On November 27, 2013,

Commerce issued its Timken Notice and for the first time, explicitly stated that CBP was

instructed to continue to collect CVD cash deposits from TUTRIC at 6.85%, claiming that the

Section 129 Implementation had set a new rate for TUTRIC that was not impacted by the court's

order sustaining the 3.93% rate. See Certain New Pneumatic Off-the-Road Tires From the

People's Republic of China: Notice of Decision of the Court of International Trade Not in

Harmony and Notice of Amended Final Determination, 78 Fed. Reg. 70,917, 70,917–18 (Dep't

Commerce Nov. 27, 2013) ("OTR Timken Notice").

TUTRIC initially brought a separate action seeking a writ of mandamus compelling

Commerce to issue a revised Timken Notice with instructions to CBP to collect cash deposits at

the 3.93% rate sustained by the court. See Tianjin United Tire & Rubber Co. v. United States,

Court No. 14-00176. TUTRIC subsequently voluntarily dismissed that separate action and

instead brought the current motion to enforce the court's October 30, 2013, judgment and an

alternative petition for a writ of mandamus. TUTRIC argues that Commerce has incorrectly

interpreted the Statement of Administrative Action accompanying the URAA ("SAA")[4] as

indicating that Section 129 implementations supersede domestic litigation on all calculation

---

[4] Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 1027, reprinted in 1994 U.S.C.C.A.N. 4040, 4314 (hereinafter "SAA"); 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

aspects and that Commerce did not make it clear through the Section 129 Implementation or the Remand Results that it was going to continue to collect cash deposits at the 6.85% rate. Pl. Br. at 19–27. The government responds that although the numeric value of TUTRIC's cash deposit rate did not change in the Section 129 Implementation, the rationale underlying it did change, making it a new rate that would apply prospectively. Gov. Br. at 15–16. The government further argues that it has the ability to address in a Section 129 proceeding issues not raised before the WTO. See Gov. Br. at 25–27. For the reasons set forth below, the Section 129 Implementation did not preclude the court from issuing its judgment nor does it preclude the court from ordering compliance with that judgment.

## JURISDICTION AND STANDARD OF REVIEW

The CIT has exclusive jurisdiction over civil actions commenced under Section 516A of the Tariff Act of 1930. 28 U.S.C. § 1581(c). The court has jurisdiction over supplemental matters such as the present matter that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Int'l Custom Prods. v. United States, 29 CIT 1105, 1109, 395 F. Supp. 2d 1291, 1294 (2005); United States v. Hanover Ins. Co., 18 CIT 991, 992, 869 F. Supp. 950, 952 (1994); see also Diamond Sawblades Mfrs. Coal. v. United States, Slip Op. 13-130, 2013 WL 5878684, at *2 (CIT Oct. 11, 2013) (exercising jurisdiction over a challenge to the continued revocation of an antidumping order after a Section 129 determination revoked that order) ("Diamond Sawblades VI"). Because the court possesses the same powers as a district court of the United States, 28 U.S.C. § 1585, it also has supplemental jurisdiction as provided in 28 U.S.C. § 1367(a), except perhaps in certain limited circumstances not present here, as well as mandamus jurisdiction as set forth in 28 U.S.C.

§ 1361. Diamond Sawblades Mfrs. Coal. v. United States, 33 CIT 1422, 1429–30, 650 F. Supp. 2d 1331, 1338–39 (2009) ("[T]he court has jurisdiction to determine the effect of, and enforce its own judgments . . . .") ("Diamond Sawblades III"). Even when aspects of a case are appealed, the court retains jurisdiction to enforce its judgment and to adjudicate matters unrelated to the issues on appeal. See Williamson v. Recovery Ltd. P'ship, 731 F.3d 608, 626 (6th Cir. 2013). Here, the issues presently before the court pertain to the enforcement of the court's order and are unrelated to the parties' claims that were appealed and subsequently affirmed. Accordingly, the court has jurisdiction to decide the current dispute. Id.

The court will grant a motion to enforce a judgment "when a prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it, even if the noncompliance was due to misinterpretation of the judgment." Heartland Hosp. v. Thompson, 328 F. Supp. 2d 8, 11 (D.D.C. 2004); see also Hanover Ins. Co., 18 CIT at 1001, 869 F. Supp. at 958 (denying a motion for contempt but directing the parties to "settle an order that will ensure compliance with the terms of [the court's] decision").

## DISCUSSION

### I. TUTRIC Properly Challenged Its CVD Rate at the CIT

The government and Titan argue that TUTRIC has lost its right to challenge the 6.85% cash deposit rate because it did not object to Commerce's intended continued application of the higher cash deposit rate either during the Section 129 proceeding or during the subsequent court remand proceeding. The government asserts that TUTRIC had the obligation to affirmatively raise the loan repayment issue during the Section 129 proceeding and that Commerce would have then had the discretion to determine whether to incorporate that issue into the Section 129

proceeding. Def.'s Resp. to the Ct.'s Questions 3–5, ECF No. 443 ("Gov. Resp. to Questions"). When TUTRIC failed to do so, the government argues TUTRIC was on notice that it received a "new" rate, even though it was the old rate, and thus had an affirmative duty to challenge that new rate by challenging the Section 129 Implementation. See id. Of course, a challenge at that stage would seem to be doomed to failure in the government's view. Lastly, the government claims to have made clear in the Remand Results its interpretation of the Section 129 proceeding as having superseded the domestic litigation, putting the impetus on TUTRIC to challenge that interpretation in challenging the Remand Results. Gov. Br. at 6, 16–18, 24–25. For the reasons set forth below, the court disagrees with the government.

First, neither Section 129 nor the SAA compels Commerce's interpretation that any argument not raised in the Section 129 proceedings is essentially waived and any ongoing domestic litigation concerning that argument is essentially mooted. Section 129 provides that Commerce shall "issue a determination in connection with the particular proceeding that would render the administering authority's action . . . not inconsistent with the findings of the . . . [WTO] Appellate Body." 19 U.S.C. § 3538(b)(2). In ThyssenKrupp Acciai Speciali Terni S.p.A. v. United States, the Federal Circuit determined that Section 129 is ambiguous and does not explicitly require or prohibit Commerce from addressing issues not raised before the WTO. 603 F.3d 928, 934 (Fed. Cir. 2010). In that case, Commerce argued that the Section 129 proceeding was limited to the issues considered by the WTO, and the Federal Circuit determined that such an interpretation was reasonable under the second step of Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43 (1984). The Federal Circuit indicated, however, that Section 129's "limited reference to making the action not inconsistent

with the findings of the Appellate Body leans toward precluding" Commerce from revisiting

issues not raised before the WTO.  ThyssenKrupp, 603 F.3d at 934.  Second, the SAA's

language is replete with conditional and permissive phrasing[5] indicating that Section 129

determinations are not intended to automatically occupy the entire field of litigation concerning

the subjects of the WTO challenge.  Accordingly, nothing in the plain language of the SAA or

Section 129 prevents the court from definitively ruling on a completely separate and distinct

calculation issue (as well as on the validity of the CVD order) not addressed before the WTO or

in the Section 129 Implementation.  Further, no policy reason prevents the court from resolving

this matter.[6]

_____

[5] The SAA states:

> In some cases, implementation of section 129 determinations may render moot all or some issues in pending litigation in connection with the agency's initial determination.  For example, should the Trade Representative direct Commerce to implement a section 129 determination that changes the cash deposit rate, such action could render moot any pending domestic litigation solely involving the amount of the cash deposit rate, as opposed to the validity of the underlying antidumping or countervailing duty order.  If, by contrast, the litigation also involved the validity of the original determination, the court or binational panel would still have to render an opinion on that subject.

 SAA, H.R. Doc. No. 103-316, vol. 1 at 1027, 1994 U.S.C.C.A.N. at 4314 (emphases added).


[6] Congress has specified an intent to allow parties to challenge cash deposit rates in domestic courts.  See 19 U.S.C. § 1516a(a)(2); 28 U.S.C. § 1581(c).  It also specified an intent to implement adverse WTO rulings in a limited and detailed fashion.  See SAA, H.R. Doc. No. 103-316, vol. 1 at 1022–27, 1994 U.S.C.C.A.N. at 4311–14 (detailing the precise method by which WTO rulings can be implemented and indicating that they are only implemented when the USTR, in consultation with Congress, determines they should be implemented).  Finally, here, enforcing the 3.93% rate will not risk putting the United States out of compliance with its WTO obligations.  See Understanding on Rules and Procedures Governing the Settlement of Disputes

(continued...)

Even if Commerce's interpretation of Section 129 ultimately would be reasonable, TUTRIC was not on notice that it could and was in fact required to bring its rate challenge based on the loan repayment during this particular Section 129 proceeding. Commerce's past practices indicated that Section 129 proceedings are limited to the issues raised before the WTO. First, there is a published Federal Circuit decision in which Commerce argued against broadening the scope of a Section 129 proceeding to include an issue not discussed by the WTO. ThyssenKrupp, 603 F.3d at 934.[7] Commerce now asks the court to uphold as reasonable the seemingly opposite interpretation of Section 129, namely that Section 129 proceedings are not limited to the issues considered by the WTO and that parties must raise all of their challenges in such proceedings. Gov. Resp. to Questions at 3–5. Second, although courts have not had many occasions to rule on the scope of the effect of Section 129 implementations, the previous cases

---

[6](...continued)

arts. 21, 22.1, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 2, 1869 U.N.T.S. 414–15 (establishing the obligations as implementing adverse WTO rulings within a reasonable period of time or be subject to retaliation). Under Section 129, after consulting with Congress and Commerce, the USTR may instruct Commerce to issue a new decision "not inconsistent with the findings of the [WTO]." 19 U.S.C. § 3538(b); U.S. Steel Corp. v. United States, 621 F.3d 1351, 1355 (Fed. Cir. 2010). The 3.93% rate is lower than the rate set in the Section 129 Implementation and is based on calculation issues completely separate and apart from the issues decided before the WTO and in the Section 129 Implementation. Thus the argument that applying the 3.93% could bring the United States out of compliance with its WTO obligations is meritless. Further, penalizing respondents because a concerned foreign government pursues other complaints before the WTO turns the whole process on its head.

[7] ThyssenKrupp is distinguishable from the case at hand, as in that case the court proceedings on the issue that was not before the WTO were concluded prior to the Section 129 proceeding, whereas here, the issue was ongoing at the CIT during the pendency of the Section 129 proceeding. See ThyssenKrupp, 603 F.3d at 931–32, 934. The court need not resolve whether Commerce may broaden Section 129 proceedings to address non-WTO related issues under facts differing from those of ThyssenKrupp.

that have addressed the issue also support enforcing the court-determined 3.93% cash deposit

rate.  In one of the few cases concerning a Section 129 determination, the court stated that a

Section 129 determination could not prevent the court from ruling on a distinct issue.  See

Diamond Sawblades VI, 2013 WL 5878684, at *2.[8]

Titan cites determinations in two administrative proceedings arguing that Commerce has

at least considered broadening the scope of Section 129 proceedings on prior occasions.  Def.-

Intvr's Resp. to the Ct.'s Order of Mar. 25, 2015, 3, ECF No. 442 ("Def.-Intvr's Resp. to

Questions").  Those proceedings, however, are both distinguishable.  In Certain Cut-to-Length

Carbon-Quality Steel Plate from Italy, Commerce denied a request to apply the results of an

unrelated remand determination that was the subject of ongoing litigation at the CIT.  See Issues

and Decision Memorandum for the Determination under Section 129 of the Uruguay Round

Agreements: Certain Cut-to-Length Carbon-Quality Steel Plate from Italy at 17, C-475-827 (Oct.

24, 2003), available at http://enforcement.trade.gov/download/section129/Italy-CTL-Plate-129-

Final-Decision-Memo_Signed-10-24-03.pdf (last visited May 11, 2015).  In the other

determination cited by Titan, Commerce said that it could be appropriate to consider new

---

[8] Throughout the Diamond Sawblades saga, the court repeatedly held that it had
jurisdiction and that Commerce could not act to deprive the court of the ability to grant relief to
the complaining party.  See e.g., id.; Diamond Sawblades Mfrs. Coal. v. United States, Slip Op.
12-46, 2012 WL 1059369, at *2 (CIT Mar. 29, 2012) ("Diamond Sawblades V"); Diamond
Sawblades Mfrs. Coal. v. United States, Slip Op. 11-137, 2011 WL 5244699, at *4 (CIT Nov. 3,
2011) ("Diamond Sawblades IV").  The court has even described a Section 129 determination as
"interlocutory, i.e. provisional, and dependent upon the outcome of this matter."  Diamond
Sawblades VI, 2013 WL 5878684, at *2.  "[N]othing in the URAA prohibits a court from
keeping an issue alive or taking action to prevent interference with its jurisdiction."  Diamond
Sawblades IV, 2011 WL 5244699, at *4.  How this should be accomplished under the facts of
this case is not particularly clear.

subsidy allegations raised for the first time during a Section 129 proceeding, but ultimately refused to consider the new allegations even where those allegations arose only because of "the WTO-dictated results." See Issues and Decision Memorandum for the Section 129 Determination: Corrosion-Resistant Carbon Steel Flat Products from France: Final Results of Expedited Sunset Review of Countervailing Duty Order at 16–17, C-427-810 (Oct. 23, 2003), available at http://enforcement.trade.gov/download/section129/French-Corrosion-Sunset-129-Final-Decision-Memo_Signed-10-24-03.pdf (last visited May 11, 2015). In neither case did Commerce broaden the scope of the Section 129 proceeding or take the position that the complaining party was required to bring the non-WTO related challenge during the Section 129 proceeding, the position Commerce is currently asking the court to accept. Thus the results of those proceedings would not have put TUTRIC on notice that it had to bring the loan repayment challenge during the Section 129 proceeding or risk losing the right to the benefits of such a challenge received through the court proceeding.

Although "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," Smiley v. Citibank (S.D.), N.A, 517 U.S. 735, 742 (1996), here, the sudden and unexplained change is likely arbitrary and capricious. See id. First, it did not become obvious that Commerce would take a divergent interpretation from that in ThyssenKrupp until sometime after the Section 129 and Remand proceedings were completed and Commerce issued the OTR Timken Notice.[9] Accordingly, TUTRIC was not on notice of the need to challenge such an interpretation or to bring its claim based on the loan repayment before Commerce during the

---

[9] In reality, this position likely was not known until briefing on the current motion.

Section 129 proceeding or to bring its challenge to Commerce's interpretation of Section 129 during the Remand proceeding. Second, Commerce does not acknowledge that it is diverging from its interpretation of the proper scope of Section 129 proceedings as set forth in ThyssenKrupp. Thus, it does not explain why such a change would be reasonable or warranted. See Gov. Resp. to Questions; Resp. of Pl. to the Mar. 25, 2015 Procedural Order 4–9, ECF No. 444 ("Pl.'s Resp. to Questions"). Commerce obviously has a duty to harmonize the parts of the unfair trade statute to make it administrable, but it has to make its determination as to how to do so in a considered way so that some consistency will result.[10]

Additionally, none of Commerce's actions in the current case put TUTRIC on notice. The USTR's instructions in this case were similar to those in the cases in which Commerce limited the scope of the relevant Section 129 proceedings. See ThyssenKrupp, 603 F.3d at 931; U.S. Steel Corp. v. United States, 33 CIT 984, 1002, 637 F. Supp. 2d 1199, 1217–18 (2009) (sustaining Commerce's decision not to broaden the scope of a Section 129 proceeding to address an issue not before the WTO and noting that this was supported by Commerce's indication that the purpose of the Section 129 proceeding was to implement the WTO report in a similar manner to the Section 129 Implementation at issue here); Pl.'s Resp. to Questions at 6. Thus nothing in the USTR's instruction or in Commerce's notice initiating the Section 129 proceeding indicated to TUTRIC that the Section 129 proceeding could and would address issues not raised before the WTO. Accordingly, there was no indication in Commerce's actions

---

[10] It may be that Commerce needs to establish procedures to protect all parties and to arrive at one final rate stemming from disparate proceedings, but it did not provide notice of such procedures in this case.

in this case or in its past practices that would have made it clear to TUTRIC what it needed to do to preserve its rate challenge based on the loan repayment.

TUTRIC also observes that although Commerce may have referred to rates in the Section 129 Implementation as "new" and "revised," that language did not apply to TUTRIC's unchanged rate, particularly because another respondent's rate did change,[11] as did the "All Others" rate.  Pl. Br. at 23–24.  Accordingly, such references throughout the Section 129 Implementation are properly viewed as referring to those changed rates as opposed to TUTRIC's unchanged rate.  TUTRIC is correct that its CVD rate was not "new," "amended," or "revised." Thus as a practical matter, TUTRIC could not have objected to the statements in the Section 129 Implementation or Remand Results until the publication of the OTR Timken Notice, because up until that point, Commerce had not made clear its intent to continue to utilize the 6.85% rate as the deposit rate, no matter the result of this litigation.  If it had, presumably TUTRIC would have objected, and if Commerce did not agree at either stage, the court would have ordered the same relief given here.

Finally, given that the loan repayment had no bearing on the other issues addressed during the Section 129 proceeding, even if TUTRIC had raised it as a challenge during the Section 129 proceeding, there is nothing indicating that Commerce, assuming arguendo that it could, would have accepted that invitation to broaden the scope of the Section 129 proceeding to include the remedy TUTRIC has already obtained.  In fact, Commerce's past practice suggests that it would not have broadened the scope.  How TUTRIC then would preserve its rights is not a

---

[11] That respondent was Guizhou Tyre Co., Ltd.

question that Commerce has definitively answered in this case.  Whether TUTRIC was required

to ask that the Section 129 proceeding be kept open pending the court case or take some other

action not specified in the statute or regulations is not explained.  Accordingly, even if TUTRIC

had followed the government's suggestion here that it raise the issue in the Section 129

proceeding, TUTRIC likely would have ended up asking the CIT for the exact same relief it is

currently seeking.

## II.  Neither Titan Nor the Government Will Be Prejudiced by the Enforcement of the Court's Judgment

Further supporting the court's decision to require Commerce to issue a revised Timken

Notice setting TUTRIC's CVD cash deposit rate at 3.93% based on the unique facts of this case

is that neither Titan nor the government will be prejudiced by the enforcement of the judgment.

Although Titan supports the government's interpretation of the Section 129 Implementation, it

will not be prejudiced if the court enforces its judgment.  TUTRIC is not getting any more of a

benefit than the court has already determined it is entitled to.  Even if TUTRIC had divined at

some point in the Section 129 proceeding that it needed to raise the loan repayment issue with

respect to that proceeding, it either would have been granted the 3.93% rate or a similar rate by

Commerce based on its determination that the loan was partially repaid, or the parties would

have ended up before the CIT upon TUTRIC's challenging Commerce's faulty determination in

the Section 129 proceeding (assuming Commerce adopted the 6.85% rate).  In the end, the result

would have granted TUTRIC the same benefit of the 3.93% CVD cash deposit rate.[12]

_____

[12] Enforcing the 3.93% CVD rate will not inequitably impact the AD rate.  Def.-Intvr's Resp. to Questions at 7–9.  In the Section 129 proceeding, Commerce decided to adjust the AD cash deposit rates through the double remedy adjustment only for input subsidies.  Id.  As

(continued...)

**III.     TUTRIC Has No Adequate Alternative Remedies**

The government and Titan also suggest that one way for TUTRIC to receive the benefit

of the court's order sustaining the 3.93% CVD rate would be for TUTRIC to ask for an

administrative review.  TUTRIC, however, does not have to pursue every potential avenue of

relief, particularly one which would simply expend agency, court, and the parties' time for no

purpose.  That is, the parties are precluded from re-litigating the loan repayment issue, as it has

already been fully litigated, and the factual and legal determinations have been made.  The only

differing result TUTRIC could expect from an administrative review would be a rate stemming

from something like a methodological change in calculating the discount rate.  See New

Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of

Countervailing Duty Administrative Review, 75 Fed. Reg. 64,268, 64,272 (Dep't Commerce

Oct. 19, 2010) (adopted without changes by New Pneumatic Off-the-Road Tires From the

People's Republic of China: Final Results of Countervailing Duty Administrative Review, 76

Fed. Reg. 23,286 (Dep't Commerce Apr. 26, 2011)).  Obviously, no party was interested in

pursuing this type of issue as reviews were not sought.  Although both Titan and the government

admit that asking for an administrative review at this point would still subject certain entries to

the higher 6.85% rate, they claim that this is TUTRIC's fault for not requesting an administrative

review sooner.  See Gov. Resp. to Questions at 4–5 (administrative review would not cover

entries from August 21, 2012, through December 31, 2013).  As indicated, here TUTRIC was

not on notice that this was the remedy is must pursue.  Further, although the government

---

[12](...continued)
TUTRIC's loan repayment did not impact its input subsidies, the change to the CVD cash
deposit rate thus will not impact TUTRIC's AD rate.

suggests an administrative review as an adequate alternative remedy, it argues that because each administrative review is a separate matter from an investigation, Commerce would not be bound by the court's determination of the loan repayment issue; the government does not provide support for this point. See Gov. Resp. to Questions at 6–7. Titan, on the other hand, concedes that absent new facts Commerce would be bound by the court's determination of the loan repayment issue. Def.-Intvr's Resp. to Questions at 7. Titan is correct, and given the fact that the loan repayment issue deals with a non-recurring subsidy, the facts surrounding the loan and its subsequent repayment would not change from year to year. There is no continuing issue regarding repayment of the loan that could be addressed again, making an administrative review both an inadequate and an unnecessary alternative remedy under the facts at hand.

**IV.     The Court Has the Power to Interpret Its Own Rulings**

Although the government claims that in sustaining the Remand Results the court sustained the use of the 6.85% cash deposit rate, the court is the final authority on interpreting its own rulings. See Energy Recovery, Inc. v. Hauge, 745 F.3d 1353, 1356 (Fed. Cir. 2014) (applying Fourth Circuit law); SEC v. Hermil, Inc., 838 F.2d 1151, 1153 (11th Cir. 1988); D&M Watch Corp. v. United States, 16 CIT 285, 296, 795 F. Supp. 1160, 1169 (1992) (ordering reliquidation of entries to comply with court's previous judgment). The court's ruling sustained Commerce's Remand Results, which did three things: first, it set TUTRIC's specific CVD rate at 3.93%; second, it confirmed that Starbright's cash deposit rate would continue to be based on the rate set in the intervening administrative review; and finally, it confirmed that the rate for "all other respondents" would continue to be based on the Section 129 Implementation. Remand Results at 50–51. Because cash deposits are based on the specific CVD rate assigned, the

Remand Results implicitly set TUTRIC's CVD cash deposit rate at 3.93%.  Id. at 50.

As noted, after specifically determining TUTRIC's rate, Commerce stated in the Remand Results, "[a]s a consequence of these intervening determinations, should the Court sustain this remand redetermination, the cash deposit rates in effect for subsequent entries will continue to be based on the intervening administrative review for Starbright and the intervening 129 Implementation Notice for all other respondents."  Remand Results at 51.  The government argues that this clearly indicated Commerce's intention to collect cash deposits from TUTRIC at the 6.85% set in the Section 129 Implementation.  Gov. Br. at 16–18.  The government and Titan argue that because the Section 129 Implementation used the words "new determination," "revised" margins, and "appropriate rate[s] . . . specified above" there was no ambiguity such that the Remand Results clearly indicated that Commerce would continue to apply the 6.85% rate to TUTRIC.  As described above, there was no such clarity.

The Remand Results did not specifically state what TUTRIC's cash deposit rate would be.  Commerce was cryptic at best in the Remand Results by using the term "all other respondents" when "All Others" were a specific group given a separate rate in the Section 129 Implementation.  By using nearly identical terms to mean different things in the two related documents after specifically treating TUTRIC separately in the Remand Results, Commerce did not indicate to the court that it intended to deviate from the normal practice of setting the cash deposit rate at the CVD rate set in a remand determination.  Further, the Section 129 Implementation was, at best, ambiguous, because it stated that Commerce would apply "appropriate" cash deposit rates, but did not indicate that meant it would apply the "amended" or "revised" rates stated therein; it could just as easily have meant the rate that the court determined

to be supported by substantial evidence.  Accordingly, in sustaining the <u>Remand Results</u>, the court sustained the normal result, which is to apply the CVD rate set in the <u>Remand Results</u> because it is the most current and accurate estimate of the duties to be paid.  <u>See</u> 19 U.S.C. § 1671d(c)(1)(B)(ii); <u>Allegheny Ludlum Corp. v. United States</u>, 346 F.3d 1368, 1373 (Fed. Cir. 2003); <u>Decca Hospitality Furnishings, LLC v. United States</u>, 30 CIT 357, 372, 427 F. Supp. 2d 1249, 1263 (2006).  Commerce's actions, which hid the ball and later applied the higher rate the court had held to be unsupported by substantial evidence, were inappropriate, even if inadvertently so.  In context, the "all other respondents" language from the <u>Remand Results</u> meant any party other than Starbright or TUTRIC.  The court's order sustaining the <u>Remand Results</u> thus adopted the 3.93% rate as the rate to be applied to all of TUTRIC's suspended and unliquidated entries and as TUTRIC's prospective cash deposit rate.

Given the language chosen by Commerce in the <u>Section 129 Implementation</u> and the <u>Remand Results</u> and given the lack of harm to Titan in this case, Commerce is charged with any error.  This is the efficient and fair result.  Whether Commerce makes clear parties' obligations in parallel WTO and court proceedings in a way that complies with the statute, but in a manner different from this case, is left for another day.  Contrary to Titan's contention, the judgment does not need to be amended to grant the relief TUTRIC seeks.  Because Commerce has not complied with the court's judgment, TUTRIC's motion to enforce the judgment will be granted. <u>See</u> <u>Heartland Hosp.</u>, 328 F. Supp. 2d at 11–12.

## CONCLUSION

For the foregoing reasons, TUTRIC's motion to enforce the judgment is granted. Commerce shall issue a revised Timken Notice setting the cash deposit rate for TUTRIC at

3.93%.  As the court has continued its original injunction of liquidation, <u>see</u> Order, ECF No. 448

(May 5, 2015), when liquidation instructions are issued, they shall reflect the court's original

direction to liquidate only in accordance with the final and conclusive judgment in this matter.

Thus, the court need not order anew that refunds be made.


               _/s/  Jane A. Restani_
                  Jane A. Restani
                     Judge

Dated: May 18, 2015
        New York, New York