Slip Op. 26-8

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

**NEIMENGGU FUFENG BIOTECHNOLOGIES CO., SHANDONG FUFENG FERMENTATION CO., LTD., and XINJIANG FUFENG BIOTECHNOLOGIES CO., LTD.,**

**Plaintiffs,**

**and**

**MEIHUA GROUP INTERNATIONAL (HONG KONG) LIMITED, and XINJIANG MEIHUA AMINO ACID CO., LTD.,**

**Consolidated Plaintiffs,**

**v.**

**UNITED STATES,**

**Defendant.**

</td>
<td>

**Before: Gary S. Katzmann, Judge**
**Consol. Court No. 23-00068**

</td>
</tr>
</table>

## OPINION AND ORDER

[ Commerce's Remand Results are sustained in part and remanded in part. ]

Dated: January 30, 2026

Dharmendra N. Choudhary, Ned H. Marshak, and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C. and New York, N.Y., for Plaintiffs Neimenggu Fufeng Biotechnologies Co., Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd.

David Craven, Craven Trade Law LLC, of Chicago, IL, for Consolidated Plaintiffs Meihua Group International (Hong Kong) Limited and Xinjiang Meihua Amino Acid Co., Ltd.

Daniel Bertoni, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant the United States. With him on the briefs were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K.

Hogan, Assistant Director.  Of counsel on the brief were Spencer Neff, Assistant Chief Counsel and Shanni Alon, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Katzmann, Judge:  The U.S. Department of Commerce ("Commerce") has imposed an antidumping duty order on imports of xanthan gum from China for over a decade.  See Xanthan Gum From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 78 Fed. Reg. 43143 (Dep't Com. July 19, 2013).  Commerce occasionally revisits this order by conducting an administrative review.  In December 2024, the court remanded the eighth such review on a challenge by Plaintiffs Neimenggu Fufeng Biotechnologies Co., Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd. (collectively, "Fufeng").  See Neimenggu Fufeng Biotechs. Co. v. United States, 48 CIT __, 741 F. Supp. 3d 1354 (2024) ("Remand Order"); see also Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 88 Fed. Reg. 9861 (Dep't Com. Feb. 15, 2023), P.R. 241 ("Final Review"), & accompanying memorandum, Mem. from J. Maeder to L. Wang, re: Issues and Decision Memorandum for Final Review (Dep't Com. Feb. 1, 2023), P.R. 233 ("IDM").  The court remanded for Commerce to reconsider or further explain why it "directly" valued Fufeng's energy coal by adding its estimated cost to normal value instead of indirectly valuing Fufeng's energy inputs with data from a surrogate company, Ajinomoto (Malaysia) Berhad ("Ajinomoto"), a Malaysian producer of monosodium glutamate.[1]  Remand Order, 741 F. Supp.

---

[1] Xanthan gum is a polysaccharide that is "commonly used as a tasteless thickener in foods, medicines, and toothpastes, and as an anti-separation agent in oil drilling."  Remand Order, 48 CIT at __, 741 F. Supp. at 1354 (citation omitted).  Monosodium glutamate, commonly known as "MSG," is a more mouthwatering "chemical flavor enhancer."  Id. at 1364 (citation omitted).

3d. at 1370.  The court further remanded for Commerce to determine which of two competing subheadings in the international Harmonized Tariff Schedules ("HTS") for classifying merchandise "is the proper subheading for the valuation of Fufeng's coal factor of production." Id. at 1376.

The results of Commerce's redetermination are now before the court.  See Final Results of Redetermination Pursuant to Court Remand Order (Dep't Com. May 6, 2025), May 6, 2025, ECF No. 53 ("Remand Results").  For the reasons explained below, the court (1) sustains Commerce's direct valuation of Fufeng's energy coal on account of Fufeng's failure to demonstrate prejudicial error; and (2) remands for Commerce to reconsider its use of HS 2701.12.9000 to perform its direct valuation.

## BACKGROUND

### I.    *Legal Background*

Determining normal value[2] can be an arduous task, particularly when the subject merchandise is exported from a non-market economy country like China.  Unlike for market economies, where normal value may be calculated on the basis of home-market prices, for non-

---

Commerce's selection of an MSG producer as a "surrogate" reflects its practice of valuing certain expenses incurred by producers in non-market-economy countries by "using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country."  Risen Energy Co. v. United States, 122 F.4th 1348, 1352, No. 2023-1550 (Fed. Cir. Dec. 9, 2024) (internal quotation marks and citation omitted).

[2] Generally speaking, "normal value" is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  And "[t]he term 'export price' means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted . . . ."  Id. § 1677a(a).

market economies Commerce is directed to "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . ." 19 U.S.C. § 1677b(c)(1).  Among these "factors of production" is "energy and other utilities consumed."  Id. § 1677b(c)(3)(C).

Once Commerce calculates the value of the factors of production, there "shall be added an amount for general expenses and profit . . . based on the best available information regarding the values of such factors in a market economy country."  Id. § 1677b(c)(1)(B).  These additional general expenses include "(1) factory overhead, (2) selling, general, and administrative expenses [("SG&A")], and (3) profit."  Stanley Works (Langfang) Fastening Sys. Co. v. United States, 37 CIT 1369, 1374, 964 F. Supp. 2d 1311, 1319 (2013).  To value them general expenses and factors of production Commerce gathers "surrogate" data from producers of comparable items in market economy countries of a similar level of economic development to the subject country.  Dorbest Ltd. v. United States, 30 CIT 1671, 1678–79, 462 F. Supp. 2d 1262, 1270–71 (2006).

Commerce then uses the following equation to derive an SG&A value to add to the value of the producer's factors of production (alongside overhead and profit).  In the equation below, "MLE" denotes material, labor, and energy costs, subscript "S" indicates values derived from a surrogate producer's financial statements, and subscript "P" indicates the derived values that Commerce adds to the factors of production to calculate normal value pursuant to 19 U.S.C. § 1677b(c)(1)(B):

$$\frac{\text{SG\&A}_S}{\text{MLE}_S + \text{Overhead}_S} \times (\text{MLE}_P + \text{Overhead}_P) = \text{SG\&A}_P$$

Def.'s Resp. and Mot. to Dismiss at 12, Feb. 27, 2024, ECF No. 31 ("Gov't Resp."); see also Dorbest, 30 CIT at 1715–16 n.36, 462 F. Supp. 2d at 1301 n.36 (providing a detailed summary of

each of Commerce's surrogate ratio calculations, including those used to calculate $MLE_P$ and $Overhead_P$); 19 U.S.C. § 1677b(e)(1)–(3).

This series of calculations includes, as relevant here, two separate junctures at which Commerce may account for energy costs in its calculation of normal value. The first is Commerce's direct calculation of the subject producer's "energy and other utilities consumed" factor of production. Id. § 1677b(c)(3)(C); see also id. § 1677b(e)(1)(B). The second is Commerce's calculation of the surrogate SG&A ratio (the fraction on the left side of the equation above): if the surrogate producer's reported SG&A value (denoted as "$SG\&A_S$" in the formula above) includes energy costs, meaning the numerator of the surrogate SG&A ratio  is greater, then multiplying the surrogate SG&A ratio by the sum of the subject producer's MLE and Overhead expenses will in turn yield a higher calculated subject-producer SG&A figure. And because Commerce includes this figure as part of the "general expenses" component of its normal value summation, 19 U.S.C. § 1677b(c)(1), including a surrogate producer's energy expenses in its SG&A ratio numerator has the indirect effect of increasing normal value.

This introduces a possibility that Commerce will "double-count" energy in its normal value calculation—first by "directly" valuing the respondent's "energy and other utilities consumed" factor of production, id. § 1677b(c)(3)(C), and then "indirectly" by including energy costs in the numerator of the surrogate SG&A ratio. This outcome is disfavored. See Zhaoqing Tifo New Fibre Co. v. United States, 39 CIT 372, 375 n.6, 60 F. Supp. 3d 1328, 1333 n.6 (2015) (explaining that "the caselaw holds that, as a general rule, double counting is not permitted in antidumping margin calculations, because it is distortive, rendering margins less accurate.").

Commerce attempts to avoid double-counting through a stated policy whereby it directly

values energy costs only in circumstances where it can ensure that it can isolate and remove energy costs from the numerator of the SG&A ratio.  See IDM at 12 (citing Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Affirmative Determinations of Sales at Less Than Fair Value, 74 Fed. Reg. 16838, 16838 (Dep't Com. Apr. 13, 2009) ("Citric Acid")).  In Citric Acid, Commerce declined to directly value respondents' reported energy inputs because Commerce was "unable to segregate and, therefore, were unable to exclude energy costs from the calculation of the surrogate financial ratios."  Id., 74 Fed. Reg. at 16839.

The court presumes familiarity with the remainder of the legal background of this case as presented in the Remand Order.  See 741 F. Supp. 3d at 1359–63.  One aspect of that presentation warrants further development here, which is the relationship between the international Harmonized System ("HS") for classifying merchandise and the various Harmonized Tariff Schedules ("HTS") through which individual countries implement the HS.  The court has explained before that "[HTS] derive from the [HS], which is a standardized numerical method used by customs authorities around the world to identify traded products when assessing duties and taxes and for gathering statistics."  Fujian Yinfeng Imp & Exp Trading Co. v. United States, 46 CIT __, __ n.7, 607 F. Supp. 3d 1301, 1309 n.7 (2022) (internal quotation marks, citation, and alterations omitted).  For example, "[t]he United States implements the HS by statute through 19 U.S.C. § 1202."  Spirit AeroSystems, Inc. v. United States, 48 CIT __, __, 680 F. Supp. 3d 1329, 1332 (2024).  "The HS assigns specific six-digit codes to commodities.  Although the first six-digit[s] are standardized across countries, individual nations may add longer codes to the first six digits for further country-specific classification, generally at the eight- or ten-digit level."  Fujian Yinfeng, 46 CIT at __ n.7, 607 F. Supp. 3d. at 1310 n.7 (internal quotation marks, citations, and alterations omitted).

In this case, Commerce appears to have classified Fufeng's reported factors of production using the subheadings of the Malaysian HTS.  See Mem. from R. Anadio to The File, re: Fufeng's Preliminary Surrogate Value Memorandum at 2 & Attach. 1 (July 29, 2022), P.R. 197.  The Government now refers to "HS" subheadings when discussing the classification of Fufeng's coal inputs.  See Remand Results at 12.  This difference in nomenclature is immaterial: the court is not aware of any relevant differences between the HS subheadings and Malaysia's implementation of those subheadings in its HTS, and observes no relevant difference between either system's chapter notes for the classification of bituminous coal.  Compare World Customs Org., Harmonized System, Subheading n.2 to ch. 27, available at https://www[.]wcotradetools[.]org/en/harmonized-system/2022/en/0527 (last visited Jan. 29, 2026) ("Note 2"), with Customs Duties Order 2022 (P.U. (A) 114/2022), Subheading n.2 to ch. 27 at 239 (Malay.) at 239, available  at https://www[.]maqis[.]gov[.]my/wp-content/uploads/2023/07/P.U.-A-114-Perintah-Duti-Kastam-2022[.]pdf (last visited Jan. 29, 2026); see also Xiping Opeck Food Co. v. United States, 45 CIT __, __, 551 F. Supp. 3d 1339, 1351 (2021) ("It is well established that courts may take judicial notice of the texts of statutes both domestic and foreign.").  In this opinion, the court will prefix the subheadings under discussion with "HS" for consistency with the Remand Results.

### II.      Factual Background

The court also presumes familiarity with the factual history of the administrative and judicial proceedings leading up to the Remand Order.  See 741 F. Supp. 3d at 1363–66.  The remand proceeding below was straightforward and brief; Commerce issued its draft  redetermination on March 4, 2025, and received administrative comments only from Fufeng.  See Draft Results of Redetermination Pursuant to Court Remand (Dep't Com. Mar. 4, 2025), Case No. A-570-985, Bar Code: 4725113-01; Letter from re: N. Marshak to H. Lutnick, Sec'y of Com., re:

Fufeng's Cmts. Pursuant to Draft Remand Redetermination (Apr. 1, 2025), Case No. A-570-985, Bar Code: 4741234-01; see also Remand Results at 15.

Commerce issued the Remand Results on May 6, 2025 and filed them with the court on the same day. Commerce found that "the changes in Ajinomoto (Malaysia)'s financial statements between reviews constitute substantial evidence which warrants the direct valuation of Fufeng's energy costs in this review," and that "that HS 2701.12.9000 is the proper subheading for the valuation of Fufeng's coal [factor of production]." Remand Results at 4, 10.

### III.    *Procedural History*

Fufeng filed comments on the Remand Results with the court on June 20, 2025. See Pls.' Cmts. on Remand Redetermination, June 20, 2025, ECF No. 58 ("Pls.' Cmts.").[3] The Government responded one month later. See Gov't Resp. to Pls.' Cmts, July 21, 2025, ECF No. 60 ("Gov't Cmts."). The court then issued written questions to the parties and solicited written responses, see Ct.'s Letter re: Suppl. Qs on Remand Results, July 30, 2025, ECF No. 61; Ct.'s Second Letter re: Suppl. Qs on Remand Results. Sept. 26, 2025, ECF No. 66, and the parties timely responded, see Gov't Resp. to Ct.'s Qs ("Gov't Resp. to Suppl. Qs"), Aug. 7, 2025, ECF No. 62; Pls.' Resp. to Ct.'s Qs, Aug. 7, 2025, ECF No. 63; Pls.' Second Resp. to Ct.'s Qs, Dec. 15, 2025, ECF No. 75 ("Pls.' Second Resp. to Suppl. Qs"); Gov't Second Resp. to Ct.'s Qs, Dec. 15, 2025, ECF No. 76. The court did not hold oral argument on the present challenge to the Remand Results.

### JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c), which gives the court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930." When

---

[3] Consolidated Plaintiffs Meihua Group International (Hong Kong) Limited and Xinjiang Meihua Amino Acid Co., Ltd. did not submit comments on the Remand Results.

reviewing an antidumping determination, the court is to "hold unlawful any determination, finding, or conclusion" that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1).

"Substantial evidence" refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted). Commerce must account for "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (internal quotation marks omitted). "Accordance with law" under 19 U.S.C. § 1516a(b)(1)(B)(i) "includes compliance with the court's remand order." SMA Surfaces, Inc. v. United States, 47 CIT __, __, 658 F. Supp. 3d 1325, 1328 (2023).

Commerce must also provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). An explicit statement of reasoning is not necessarily required; the court may uphold an agency's action even where "the agency's decisional path is reasonably discernable." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

As the court reviews agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. Specifically, "[i]n the antidumping context, a party challenging a purported error by Commerce must show that it was harmed as a result of the error." SolarWorld Ams., Inc. v. United States, 962 F.3d 1351, 1359 (Fed. Cir. 2020); see also id. at n.2 (confirming that the harmless-error rule of 5 U.S.C. § 706 applies to judicial review of Commerce's antidumping

administrative reviews "since no law provides otherwise").

## DISCUSSION

### I.    Commerce's Direct Valuation of Fufeng's Energy Factors of Production Remains Insufficiently Explained but Constitutes Harmless Error

The court identified the following problems with Commerce's previous explanation for its

direct valuation of Fufeng's energy factors of production:

> Commerce did not explain why the narrower "administrative and other expenses" line item—which it now considers to house energy expenses—does not continue to blend those expenses with the [general and administrative ("G&A")] expenses that remained within the line item even after Ajinomoto's spin-off of "selling and distribution" expenses.  Nor did Commerce point to any evidence that energy expenses predominate over G&A within "administrative and other expenses," or over any other type of expense that might fall under that imprecisely-worded line item.

Remand Order, 741 F. Supp. 3d at 1369.  The court noted that Commerce "thus failed to articulate

why . . . the disaggregation of 'selling and distribution expenses' from 'other operating expenses'

would for the first time allow Commerce to segregate and[] therefore exclude energy costs from

the calculation of the surrogate financial ratios."  Id. (internal citations, quotation marks, and

alteration omitted).

### A.    The Substance of Commerce's Explanation on Remand

As an initial matter, the court observes that Commerce did not provide adequate

explanations on remand.  To the court's concern about "why the narrower 'administrative and

other expenses' line item . . . does not continue to blend [energy] expenses with the 'G&A'

expenses that remained within the line item," id., Commerce acknowledged that "it is impossible

to ascertain the extent to which energy expenses 'predominate over G&A,' " but stated that

"neither the [c]ourt nor Fufeng dispute Commerce's finding that energy is contained in the

'administrative and other expenses' line item."  Remand Results at 18 (quoting Remand Order,

<u>741 F. Supp. 3d. at 1369</u>). Commerce asserted that Ajinomoto's energy expenses are "sufficiently isolated such that we are able to exclude energy costs from the calculation of surrogate financial ratios while still including an amount for SG&A in the numerator of the ratio." <u>Id.</u> at 8 (footnote omitted) (citing IDM at 14).

This assertion is not entirely satisfactory. Commerce determined in prior administrative reviews that Ajinomoto's energy expenses were insufficiently isolated because they resided in the "other operating expenses" line item and could not be separately identified. <u>See, e.g.</u>, <u>Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018</u>, 84 Fed. Reg. 64831 (Dep't Com. Nov. 25, 2019), & accompanying memorandum, Mem. from J. Maeder to J. Kessler, re: Issues and Decision Memorandum at cmt. 4 (Dep't Com. Nov. 18, 2019). Commerce has now determined that the energy expenses are "sufficiently isolated" because they reside in "administrative and other expenses." <u>See</u> <u>Remand Results</u> at 8. Why the switch? As the court pointed out in the <u>Remand Order</u>, it is not clear that removing "selling and distribution expenses" from "other operating expenses" would result in a line item that could reasonably be expected to isolate energy expenses from SG&A expenses. <u>See</u> 741 F. Supp. 3d at 1369. The removal might reveal some information about what "administrative and other expenses" does not contain, but it reveals little about what it does contain.

The court remains unpersuaded that Commerce has provided "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A).

###### B. *The Court's Exercise of Remedial Discretion to Apply the Harmless-Error Principle*

Commerce's less-than-satisfactory explanation, however, does not compel remand on this issue. The harmless-error principle, otherwise known as the rule of prejudicial error, bars relief. "It is well settled that principles of harmless error apply to the review of agency proceedings." Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996) (citing 5 U.S.C. § 706).[4] The principle is that "[a] remand is unnecessary when the error in question 'clearly had no bearing on the procedure used or the substance of decision reached' . . . ." Oracle Am., Inc. v. United States, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (quoting Mass. Trs. of E. Gas & Fuel Assocs. v. United States, 377 U.S. 235, 248 (1964)). "A party is not 'prejudiced' by a technical defect simply because that party will lose its case if the defect is disregarded. Prejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect." Intercargo, 83 F.3d at 396.[5]

---

[4] Plaintiffs incorrectly suggest that the harmless-error principle "does not apply in analyzing whether an agency's substantive decision is supported by substantial evidence and in accordance with law." Pls.' Second Resp. to Suppl. Qs at 4. The Federal Circuit has applied the harmless-error principle in considering whether agency determinations are supported by substantial evidence and in accordance with law. For example, in Prime Time Commerce, LLC v. United States, the Federal Circuit found Commerce's rate calculation to be supported by substantial evidence and in accordance with law even where Commerce erred, because that error was harmless. 2022 WL 2313968 *7 (Fed. Cir. 2022) (citing Suntec Indus. Co. v. United States, 857 F.3d 1363, 1372 (Fed. Cir. 2017); Intercargo, 83 F.3d at 394).

[5] The court has a freestanding obligation to consider whether an error is prejudicial before remanding on the basis of that error. In Shinseki v. Sanders, the Supreme Court identified "a congressional preference for determining 'harmless error' without the use of presumptions insofar as those presumptions may lead courts to find an error harmful" in the federal harmless-error statute." 556 U.S. 396, 407–08 (2009) (citing 28 U.S.C. § 2111). The Administrative Procedure Act also requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki, 566 U.S. at 409. Under this mandate, even if the Government

The error that Fufeng attributes to Commerce did not prejudice Fufeng in any identifiable respect. Recall that when Commerce directly values a respondent's energy factor of production, it disregards energy expenses in the numerator of the surrogate SG&A ratio. See Remand Order, 741 F. Supp. 3d at 1361. Commerce does so for the specific purpose of addressing the "possibility that Commerce will 'double-count' energy in its normal value calculation—first by 'directly' valuing the respondent's 'energy and other utilities consumed' factor of production, and then by including energy costs in the numerator of the surrogate SG&A ratio." Id. (citation omitted). This practice protects a respondent's interest in avoiding an inaccurately high dumping margin. At least in theory, an injury to that interest is remediable through an action before this court. See, e.g., Zhaoqing Tifo, 39 CIT at 411–16, 60 F. Supp. 3d at 1361–65.

Not here, though. On remand, Fufeng repeats its argument that Commerce erred by "allocating the total amount of expense reported in 'administrative and other expenses' solely to the 'Energy' category[, which] significantly distorts the resulting overhead and [SG&A] ratios." Pls.' Cmts. at 5 (quoting Pls.' Mot. for J. on the Agency R. at 18, Oct. 30, 2023, ECF No. 25 ("Pls.' Mot.")). The error to which this argument refers is not just harmless to Fufeng; it is helpful. As Commerce pointed out, if "administrative and other expenses" fails to isolate energy—that is, if it contains both energy and SG&A expenses—then striking the full amount of that line item from the numerator of the surrogate ratio will "understate the SG&A expense ratio." Remand Results

---

waives an argument of non-prejudicial error, "[i]t is a separate question whether such a waiver always binds the court." United States v. Giovannetti, 928 F.2d 225, 226 (7th Cir. 1991) (per curiam) (exercising discretion to consider whether an error was harmless despite the Government's failure to make the argument) ; see also United States v. Dolah, 245 F.3d 98, 107 (2d Cir. 2001) ("We have discretion to consider the harmlessness of an alleged error even though the Government has not argued this line of defense.").

at 8. This leaves Fufeng better off than if Commerce were able to surgically extract energy expenses, and nothing else, from the numerator of Ajinomoto's SG&A ratio. Any possible distortion to the SG&A ratio that Commerce's "error" caused is a distortion in Fufeng's favor.

The court recognizes that Fufeng has an instrumental interest in pressing the issue of a "distorted" SG&A ratio. Commerce chooses indirect valuation when it identifies that direct valuation would result in too much distortion. Because indirect valuation would apparently benefit Fufeng by nixing its actual energy costs from Commerce's calculation of normal value, Fufeng would prefer that Commerce have identified an unacceptable level of distortion in the prospect of subtracting the entirety of "Administrative and Other Expenses." But indirect valuation itself is not an interest that the antidumping law protects. See Nitrogen Prods. Co. v. United States, 288 U.S. 294, 318 (1933) ("No one has a legal right to the maintenance of an existing rate or duty."). To the extent indirect valuation benefits a party, that benefit is an accidental feature of the methodology that Commerce employs to avoid distortion.

The paramount consideration here is Commerce's fulfillment of its obligation to "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise," 19 U.S.C. § 1677b(c)(1), which include "energy and other utilities consumed," id. § 1677b(c)(3)(C). Commerce did so in this case: Fufeng does not dispute that Commerce directly valued Fufeng's energy inputs and correspondingly removed Ajinomoto's energy costs from the numerator of the surrogate SG&A ratio. See Pls.' Mot. at 20. If Commerce removed additional non-energy costs from this numerator on account of its wholesale subtraction of all the undifferentiated components of "administrative and other expenses," so much the better for Fufeng. Fufeng will not be heard to argue that Commerce should

have taken greater pains to avoid giving it a windfall.

It would be another matter if Fufeng had argued that Commerce, by disregarding the entirety of "administrative and other expenses," failed thereby to disregard some other cache of energy expenses elsewhere in Ajinomoto's income statement. That argument would invoke the specter of double-counting: Fufeng has a theoretical interest in ensuring that Commerce count energy expenses either as part of Ajinomoto's SG&A ratio, or as part of Fufeng's energy factor of production, but not both. See Shenzhen Xinboda Indus. Co. v. United States, 43 CIT __, __ n.8, 361 F. Supp. 3d 1337, 1350 n.8 (2019) ("It is Commerce's longstanding, well-founded policy to avoid double counting."). In theory, double counting would harm Fufeng's interest by inaccurately inflating normal value. See Remand Order, 741 F. Supp. 3d at 1361.

But Fufeng does not raise a double-counting concern before the court. Fufeng recognizes that "administrative and other expenses" contains the full amount of Fufeng's energy expenses, and indeed Fufeng supported Commerce's "preliminary decision that energy cost is included in [that] line item" in the proceeding below. Letter from D. Choudhary to G. Raimondo, Sec'y of Com., re: Fufeng's Resubmission of Redacted Rebuttal Case Brief at 29 (Dec. 14, 2022), P.R. 231, C.R. 178. This amounts to an acknowledgement that Commerce has counted energy expenses only once—as a factor of production. The true premise of Fufeng's "distortion" argument, then, is a concern that the removal of everything in "administrative and other expenses" will inaccurately deflate normal value by subtracting non-energy costs from the surrogate SG&A ratio. Even if that concern is well-founded, Fufeng suffers no prejudice from a distortion that lowers its dumping margin. No remedy will ensue from any error that Commerce might have committed on that score.

Following its statutory mandate to take "due account . . . of the rule of prejudicial error," 5

U.S.C. § 706, and "adjust[ing] its relief to the exigencies of the case in accordance with the equitable principles governing judicial action," Ford Motor Co. v. N.L.R.B., 305 U.S. 364, 373 (1939), the court declines to remand this element of Commerce's Remand Results.

> **II.     Commerce's Selection of HS 2701.12.9000 to Value Fufeng's Energy Coal Is Unsupported by Substantial Evidence**

On remand, Commerce again selected HS 2701.12.9000 ("Coal, Whether Or Not Pulverised, But Not Agglomerated: Bituminous Coal: O/T Coking Coal") over HS 2701.19 ("Coal, Other Than Anthracite Or Bituminous, Whether Or Not Pulverized, But Not Agglomerated") to value Fufeng's energy coal factor of production. Remand Results at 10. Commerce explained that "HS subheading 2701.12.9000 explicitly covers bituminous and noncoking coal as used by Fufeng," while "HS subheading 2701.19 is a broader category, which explicitly does not cover bituminous coal and may include coking grade coal." Id. at 13. Fufeng challenges this aspect of the Remand Results, arguing again that Commerce should have chosen HS 2701.19 to value its energy coal. See Pls.' Cmts. at 16, 18.

The court concludes that Commerce did not support its choice of HS 2701.12.9000 with a reasoned explanation of why Fufeng's coal is "bituminous coal" for the purpose of classification under that subheading. The relevant chapter note to HS 2701.12.9000 provides that "'bituminous coal' means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg." See World Customs Org., Harmonized System, Subheading n.2 to ch. 27, supra. And because "[t]he section and chapter notes are integral parts of the [HS], and have the same legal force as the text of the headings," Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007), the calorific value limit of Fufeng's coal must be at least 5,833 kilocalories per

kilogram if the coal is to fall under 2701.12.9000.

Commerce did not make such a finding in either the initial proceeding or on remand. Instead, on remand, it determined that "the HS note which Fufeng references in its argument to the [c]ourt was not timely raised by Fufeng for consideration in selecting an HS category and therefore not considered by Commerce in assigning a[ surrogate value] to value Fufeng's reported coal [factor of production]." Remand Results at 20. This determination rests on a distinction between (1) Customs's classification of merchandise, which is "governed by the General Rules of Interpretation ("GRIs") of the HTSUS," Otter Prods., LLC v. United States, 834 F.3d 1369, 1375 (Fed. Cir. 2016) and where "classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes" GRI 1, and Commerce's antidumping determinations, where the GRIs do not directly govern the selection of headings and subheadings to value factors of production, see Gleason Indus. Prods., Inc. v. United States, 32 CIT 382, 389, 559 F. Supp. 2d 1364, 1371 (2008). Commerce's position, in other words, is that Commerce need not (or indeed cannot) consult Note 2 because Fufeng did not properly present it on the record below.

This distinction does not acquit Commerce of its responsibility to consult the terms of the classification system that it uses to value inputs. Even if the General Rules of Interpretation themselves do not compel this consultation in an antidumping case, Commerce still must base "the valuation of the factors of production . . . on the best available information regarding the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1). And "[d]espite the latitude afforded Commerce in selecting the best available information from among the available surrogate data for valuing the factors of production, . . . Commerce's choice of what constitutes the best

available information [must] evidence[] a rational and reasonable relationship to the factor of production it represents." Xiping Opeck, 551 F. Supp. 3d at 1348 (internal quotation marks and citations omitted).

No such relationship exists if Commerce disregards an "integral part[]" of the classification system it uses to value factors of production. See Degussa, 508 F.3d at 1047. "Bituminous" is a defined term in the Harmonized System, and Note 2 is what defines it. It is neither rational nor reasonable to use a classification system to value inputs while disregarding the part of that system that gives meaning to the classifiers. A scorecard reveals little about the events of a baseball game to someone unmoved to learn the meanings of "K" and "BB."

As a component of the Harmonized System, Note 2 is also a "legislative fact[] of general application, not specific to the parties, which the court may freely notice." Vivitar Corp. v. United States, 8 CIT 109, 112–13, 593 F. Supp. 420, 425 (1984); see also Brown v. Piper, 91 U.S. 37, 42 (1875) ("Among the things of which judicial notice is taken are the law of nations; the general customs and usages of merchants; [and] the meaning of words in the vernacular language . . . ."); cf. Xiping Opeck, 551 F. Supp. 3d at 1350 ("[R]eference to the [Integrated Tariff of the European Communities] itself makes it clear that subheading 0306.39.10 covers live, fresh or chilled freshwater crawfish. Anyone reading the Final Results could easily find the subheading itself, read it in context, and confirm that its provisions covered the product that Commerce represented it covered.").[6]

---

[6] The Government argues that the court took judicial notice of the European classification system in Xiping Opeck "in a unique context" because "in that case, Commerce had used the system in its determination, but the exact text of the description was not on the administrative record." Gov't Resp. to Suppl. Qs at 4. That aspect of Xiping Opeck is not unique; it is a feature of this case as

Commerce had an opportunity to consider the import of Note 2 during the initial proceeding, when Commerce asked Fufeng about which type of coal it utilizes. Letter from S. Bailey to B. Petelin, re: Fourth Suppl. Questionnaire at 3 (Dep't Com. July 6, 2022), P.R. 181, C.R. 163. Fufeng responded that its coal "is commercially traded as a bituminous coal," but clarified that the coal "does not fall within the HTS definition of bituminous coal . . . [b]ased on its calorific content." Letter from D. Choudhary to G. Raimondo, Sec'y of Com., re: Fufeng's Resp. to Pet'r's Request to Reject Fufeng's Fourth Supp. Questionnaire Resp. at 2–3, Case No. A-570-985, Bar Code: 4267361-01 (July 25, 2025) (citing Note 2).[7] Commerce accepted Fufeng's opening qualification but rejected the clarification. That clarification, Commerce explained, was "unsolicited new factual information" under 19 C.F.R. § 351.302(d). See Letter from S. Bailey to B. Petelin, re: Rejection of Fourth Supp. Questionnaire Resp. at 1–2 (Dep't Com. July 27, 2022), P.R. 192.

This selective rejection, whether lawful or not under 19 C.F.R. § 351.302(d), led Commerce to present what appears to be Fufeng's acknowledgment that its coal is in a general sense "bituminous." See Remand Results at 11. Commerce used what it called Fufeng's "indicat[ion] that its coal is commercially traded as bituminous coal," as a basis for determining that the coal is "bituminous for purposes of selecting an HS category." Id. at 21 (internal quotation marks and footnote omitted).

---

well. Commerce "used" the Harmonized System to value Fufeng's coal but declined to consider the "exact text" of Note 2—which defines a critical term in the subheading title—on the basis of Fufeng's failure to properly present it on the record. The court follows Xiping Opeck closely as it takes judicial notice of Note 2.

[7] Fufeng also submitted test certificates that purportedly demonstrated a sub-5,833 kg/kcal value limit for that coal. See id.

This gives a misleading picture of Fufeng's position. Although Fufeng's central point was that its coal is not "bituminous" under the specialized definition that the Harmonized System supplies, the Remand Results lead a reader to think that Fufeng asserted that its coal is bituminous. By striking an essential qualification to Fufeng's narrow acknowledgment that its energy coal is "bituminous" for certain distinct purposes, Commerce "made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988); cf. Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time.").[8]

Commerce must confront the issue that Fufeng raised. If Commerce is to choose 2701.12.9000 to value Fufeng's energy coal, it must rest that choice on substantial evidence that the coal is "bituminous" as Note 2 defines that term. See Suramerica, 44 F.3d at 985; Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1308, 1322–23 (2018). And if Fufeng's energy coal does not have "a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg," then Commerce's position that "HS subheading 2701.12.9000 explicitly covers bituminous and noncoking coal as used by Fufeng," Remand Results at 13, is incorrect.[9] HS 2701.12.9000 is not "more specific to Fufeng's

_____

[8] Although "as a general matter, the Federal Rules of Evidence do not apply where the Court conducts record review," Jinko Solar Imp. & Exp. Co. v. United States, 48 CIT __, __, 701 F. Supp. 3d 1367, 1380 (2024), Rule 106 embodies a common law rule of general application that operates "in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." Beech Aircraft, 488 U.S. at 171 (internal quotation marks and citation omitted).

[9] This is true regardless of "the relative importance of volatile matter thresholds" to the classification inquiry. Remand Results at 21. Note 2 makes clear that a calorific value limit of at least 5,833 kcal/kg is a necessary condition for "bituminous" status under HS 2701.12.9000; coal

coal [factor of production]," id., let alone "the best available information," 19 U.S.C. § 1677b(c)(1), if it excludes Fufeng's coal altogether.

Commerce must at least account for this possibility. See 19 U.S.C. § 1677f(i)(3)(A). Even the Government recognizes that "[t]he record shows that the coal used by Fufeng . . . had a calorific value limit of less than 5800 kcal/kg." Gov't Cmts. at 12, that "the record—even without the [coal test certificates] provided by Fufeng—contains Fufeng's description of its coal inputs as having a heat value of less than 5,800 Kcal/kg," and that "[n]o parties sought to undermine or dispute this evidence before Commerce, nor is this issue in dispute before this Court." Gov't Resp. at 28. The Government also "maintain[s] that the limited evidence on the record shows that Fufeng's coal has a heat value of less than 5,800 kcal/kg." Gov't Resp. to Suppl. Qs at 3.

In such a circumstance, where "[t]here is . . . some indication in the record that Respondents (or their respective suppliers) consumed bituminous coal with a calorific value that is less than 5,833 kcal/kg," and where "[i]t is unclear whether Commerce considered this evidence or found it insufficient," Commerce must reconsider its choice of HS 2701.12.9000 and provide "further explanation with respect to the applicability of Note 2." Carbon Activated Tianjin Co. v. United States, 45 CIT __, __, 503 F. Supp. 3d 1278, 1290–91 (2021). Commerce cannot otherwise "determine which of the competing subheadings constituted the best available information for valuing" Fufeng's energy coal. Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1379 (Fed. Cir. 2015).

that fails that necessary condition does not fall under that subheading even if it might satisfy other conditions. As Fufeng argues, Commerce's statement that Fufeng failed to address the relative importance of the coking designation and volatile matter limit "are irrelevant since they cannot result in the lower energy coal being classified in HTS 2701.12.9000." Pls.' Cmts. at 13 (citing Remand Results at 19).

On remand, Commerce is to reconsider which of HS 2701.12.9000 or HS 2701.19 is "the best available information" for the purpose of valuing Fufeng's energy coal factor of production. See 19 U.S.C. § 1677b(c)(1). As it undertakes this task, Commerce is to give Note 2 its due consideration as an "integral part[]" of the Harmonized System, and as an indispensable tool for ascertaining its meaning. See Degussa, 508 F.3d at 1047.

## CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that the U.S. Department of Commerce's Redetermination Pursuant to Court Remand Order (Dep't Com. May 6, 2025), May 6, 2025, ECF No. 53, is **REMANDED** for further proceedings consistent with this opinion, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within ninety days of the date of this opinion. The timeline for filings and comments regarding the second remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED.**

/s/     *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: January 30, 2026
          New York, New York